# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
K. WENDELL LEWIS, et al.,               )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )        Civil Action No. 15-1328 (RBW)
                                        )
PENSION BENEFIT GUARANTY                )
CORPORATION,                            )
                                        )
                    Defendant.          )
_____)

# MEMORANDUM OPINION

The plaintiffs, approximately 1,700 former Delta Air Lines, Inc. ("Delta") pilots, initiated

this action against the defendant, the Pension Benefit Guaranty Corporation (the "Corporation"

or the "PBGC"), challenging the Corporation's benefits determinations regarding the Delta Pilots

Retirement Plan (the "Pilots Plan" or "Plan") under the Employment Retirement Income Security

Act (the "ERISA"), 29 U.S.C. § 1303(f) (2012). See First Amended Complaint ("Am. Compl.")

¶¶ 1–14, 73–150.[1] Currently pending before the Court are the Plaintiffs' Motion for Summary

---

[1] The plaintiffs also assert a claim for breach of fiduciary duty, see Am. Compl. ¶¶ 63–72, and a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (2012), see id. ¶¶ 151–56. The Court earlier denied the Corporation's motion to dismiss the plaintiffs' claim for breach of fiduciary duty, but granted the Corporation's motion to certify the issue for interlocutory appeal. See Lewis v. PBGC, No. 15-1328 (RBW), 2017 WL 7047932, at *1–4 (D.D.C. Jan. 23, 2017) (Walton, J.). Resolution of that issue is currently pending before the District of Columbia Circuit. See Lewis v. PBGC, No. 17-5068 (D.C. Cir. filed Apr. 12, 2017). As for the plaintiffs' APA claim, the plaintiffs explain in their briefing that they only brought this claim "in the alternative, in case the Corporation was to argue . . . that the . . . APA . . . should govern their claims." Plaintiffs' Reply in Support of Their Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment ("Pls.' Reply") at 42. Both parties agree, however, "that [the p]laintiffs' claims should be governed by [the] ERISA." Id.; see also Pension Benefit Guaranty Corporation's Memorandum in Support of Its Cross-Motion for Summary Judgment and in Opposition to the Plaintiffs' Motion for Summary Judgment ("Def.'s Mem.") at 45 (claiming that the plaintiffs' APA claim "is simply a restatement of their ERISA claims"). The Court therefore dismisses the plaintiffs' APA claim as duplicative. See 5 U.S.C. § 704 (limiting judicial review of agency action pursuant to the APA to "final agency action for which there is no other adequate remedy in a court"); see also Davis v. PBGC, 864 F. Supp. 2d 148, 167 (D.D.C. 2012) (dismissing the plaintiffs' APA claim at the summary judgment stage because the plaintiffs "concede[d] that . . . [the APA claim] was brought solely as a protective claim, in case the PBGC sought to argue that this case was not cognizable under [the] ERISA"), aff'd, 734 F.3d 1161 (D.C. Cir. 2013).

Judgment ("Pls.' Mot.") and the Pension Benefit Guaranty Corporation's Cross-Motion for

Summary Judgment and Opposition to the Plaintiffs' Motion for Summary Judgment ("Def.'s

Mot."). Upon careful consideration of the parties' submissions, [2] the Court concludes for the

reasons that follow that it must deny the plaintiffs' motion and grant the Corporation's motion.

## I.    BACKGROUND

### A.    Statutory Background

The ERISA, a "comprehensive and reticulated statute," Nachman Corp. v. PBGC, 446

U.S. 359, 361 (1980), was enacted in part to "ensure that employees and their beneficiaries

would not be deprived of anticipated retirement benefits by the termination of pension plans

before sufficient funds [had] been accumulated in the plans," PBGC v. R.A. Gray & Co., 467

U.S. 717, 720 (1984). "The PBGC administers and enforces Title IV of [the] ERISA," PBGC v.

LTV Corp., 496 U.S. 633, 637 (1990), which "created the [PBGC] and a termination insurance

program to protect employees against the loss of 'nonforfeitable' benefits upon termination of

pension plans that lack sufficient funds to pay such benefits in full," Nachman, 446 U.S. at 361

n.1; see also 29 U.S.C. § 1302(a)(2) (providing that the Corporation's purpose is to, inter alia,

"provide for the timely and uninterrupted payment of pension benefits to participants and

beneficiaries under plans to which [Title IV] applies"). As the Supreme Court has explained:

> When a plan covered under Title IV terminates with insufficient assets to satisfy its
> pension obligations to the employees, the PBGC becomes trustee of the plan, taking
> over the plan's assets and liabilities. The PBGC then uses the plan's assets to cover
> what it can of the benefit obligations. The PBGC then must add its own funds to
> ensure payment of most of the remaining "nonforfeitable" benefits, i.e., those
> benefits to which participants have earned entitlement under the plan terms as of
> the date of termination. [The] ERISA does place limits on the benefits [the] PBGC
> may guarantee upon plan termination, however, even if an employee is entitled to

---

[2] In addition to the filings already identified and the Administrative Record ("AR"), the Court considered the following submissions in rendering its decision: (1) the Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pls.' Mem."); and (2) the Pension Benefit Guaranty Corporation's Reply Memorandum in Support of Its Cross-Motion for Summary Judgment ("Def.'s Reply").

> greater benefits under the terms of the plan. In addition, benefit increases resulting
> from plan amendments adopted within five years of the termination are not paid in
> full.

LTV Corp., 496 U.S. at 637–38 (internal citations omitted). When the Corporation becomes a

plan trustee, it becomes a fiduciary of the plan, see 29 U.S.C. § 1342(d)(3), and must "discharge

[its] duties . . . solely in the interest of the participants and beneficiaries and . . . for the exclusive

purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying

reasonable expenses of administering the plan," id. § 1104(a)(1)(A).

## 1. Compensation and Qualified Benefit Limits

A provision of the tax code limits the "annual compensation of each employee" that an

ERISA-qualified pension plan may "take into account" in calculating that employee's benefits

under the plan (the "compensation limit"). See I.R.C. § 401(a)(17) (2012); see also AR 15 ("The

IRC § 401(a)(17) limit . . . caps the amount of earnings a plan may use to calculate benefits

under a tax-qualified plan . . . ."). On June 7, 2001, Congress increased the compensation limit

to $200,000 in the Economic Growth and Tax Relief Reconciliation Act of 2001 (the

"EGTRRA"). See Pub. L. No. 107-16, § 611(c)(1), 115 Stat. 38, 97 (2001); see also I.R.C.

§ 401(a)(17). Congress provided that the increased compensation limit applied to plan years

beginning after December 31, 2001. See Pub. L. No. 107-16, § 611(i)(l), 115 Stat. at 100. An

IRS notice setting effective dates for the increased compensation limit, issued September 17,

2001, further provided:

> In the case of a plan that uses annual compensation for periods prior to the first plan
> year beginning on or after January 1, 2002, to determine accruals or allocations for
> a plan year beginning on or after January 1, 2002, the plan is permitted to provide
> that the $200,000 compensation limit applies to annual compensation for such prior
> periods in determining such accruals or allocations.

I.R.S. Notice 2001-56, 2001-2 C.B. 277.

Another provision of the tax code limits the annual benefit payments that a plan can make to a participant or beneficiary (the "qualified benefit limit").  See I.R.C. § 415(b).  The EGTRRA increased the qualified benefit limit to $160,000.  See Pub. L. No. 107-16, § 611(a)(l), 115 Stat. at 96; see also I.R.C. § 415(b).[3]  Congress provided that the increase to the qualified benefit limit applied to plan years ending after December 31, 2001.  See Pub. L. No. 107-16, § 611(i)(l), 115 Stat. at 100.

## 2.  Priority Categories

The ERISA establishes six categories, in descending order of priority, to which the Corporation must allocate a terminated plan's assets upon its termination.  See 29 U.S.C. § 1344(a)(1)–(6).  The first two priority categories ("PCs"), which concern benefits "derived from the participant[s'] mandatory contributions," id. § 1344(a)(2), are not relevant in this case because the Plan "never required mandatory employee contributions," AR 877.  Therefore, the highest priority category relevant in this case is PC3, which includes benefits for pilots who were retired or eligible to retire "as of the beginning of the [three]-year period ending on the termination date of the plan, . . . based on the provisions of the plan (as in effect during the [five]-year period ending on such date) under which such benefit would be the least."  29 U.S.C. § 1344(a)(3)(A), (B).

PC3 benefits are comprised of the following two categories:

(A)     in the case of the benefit of a participant or beneficiary which was in pay status as of the beginning of the [three]-year period ending on the termination date of the plan, to each such benefit, based on the provisions

---

[3] The EGTRRA also provided cost-of-living adjustments to the qualified benefit limit that would occur in subsequent years.  See Pub. L. No. 107-16, § 611(a)(4), 115 Stat. at 96; see also I.R.C. § 415(d).  Although the plaintiffs initially challenged the Corporation's determination of these cost-of-living adjustments in Claim Four of their First Amended Complaint, see Am. Compl. ¶ 115 ("The PBGC also erred in excluding the Congressional cost-of-living adjustments to the [q]ualified [b]enefit [l]imit."), they appear to have abandoned that challenge, as they do not raise the issue at all in their motion for summary judgment, see generally Pls.' Mot.; see also Pls.' Reply.  As a result, the Court need not address the issue.

of the plan (as in effect during the [five]-year period ending on such date) under which such benefit would be the least, [and]

(B)     in the case of a participant's or beneficiary's benefit (other than a benefit described in subparagraph (A)) which would have been in pay status as of the beginning of such [three]-year period if the participant had retired prior to the beginning of the [three]-year period and if his benefits had commenced (in the normal form of annuity under the plan) as of the beginning of such period, to each such benefit based on the provisions of the plan (as in effect during the [five]-year period ending on such date) under which such benefit would be the least.

For purposes of subparagraph (A), the lowest benefit in pay status during a [three]-year period shall be considered the benefit in pay status for such period.

Id. § 1344(a)(3)(A)–(B).  "These provisions exclude certain benefits from [PC3] based on whether (1) they were in pay status (i.e., actually being paid) or could have been in pay status (if an individual had retired) within three years of the date of the plan termination and (2) the provisions of the plan creating them were 'in effect' within the five-year period prior to plan termination."  Davis v. PBGC, 734 F.3d 1161, 1165 (D.C. Cir. 2013) ("Davis II").

The other PC relevant to this case is PC5, which includes "all other nonforfeitable benefits under the plan," 29 U.S.C. § 1344(a)(5), that are not guaranteed by the Corporation, see id. § 1344(a)(4)(A), and has two sub-categories.  The first subcategory, PC5(a), constitutes vested benefits as of five years prior to the plan's termination.  See id. § 1344(b)(4)(A) (defining PC5(a) benefits as those "under the plan as in effect at the beginning of the [five]-year period ending on the date of plan termination").  The second subcategory, PC5(b), constitutes all other vested benefits that went into effect on a later date, which cannot be funded unless all benefits in PC5(a) are funded, see id. § 1344(b)(4)(B) (stating that PC5(b) benefits "shall be determined" only "[i]f the assets available for allocation under [PC5(a)] are sufficient to satisfy in full th[ose] benefits").

### 3. Recovery Benefits

Benefits that are neither funded by the terminated plan's assets nor guaranteed by the Corporation may be funded, to the extent possible, by funds recovered by the Corporation from a plan's contributing sponsor. See id. §§ 1322(c); 1362(a)–(b); see also Allied Pilots Ass'n v. PBGC, 334 F.3d 93, 95–96 (D.C. Cir. 2003) ("If the terminated plan lacks sufficient funds to satisfy existing obligations to employees, thus requiring the PBGC to use its own funds to pay benefits, the PBGC has authority to recover 'the total amount of the unfunded benefit liabilities' from the plan's sponsor and members of the sponsor's 'controlled group,' i.e., entities that belong to the same corporate family as the sponsor . . . ." (citation omitted)). When the Corporation recovers unfunded benefit liabilities, see 29 U.S.C. § 1362(b)(1)(A), it is required to share a portion of those recoveries under the priority allocation scheme set forth in § 1344(a), see id. § 1322(c). The statute designates how the Corporation should calculate the portion of the recovery funds available for payment to participants and beneficiaries: it must "multiply[]—(A) the outstanding amount of benefit liabilities under the plan (including interest calculated from the termination date), by (B) the applicable recovery ratio." Id. § 1322(c)(2). For plans where "the outstanding amount of benefit liabilities exceeds $20,000,000," like the Plan in this case, the statute defines "recovery ratio" as the ratio of

   (i)  the value of the recoveries of the [C]orporation [for a single-employer plan terminated under a distress termination] to

   (ii) the amount of unfunded benefit liabilities under such plan as of the termination date.

Id. § 1322(c)(3)(C).

### 4.      Benefit Determinations and Appeals

The District of Columbia Circuit has summarized how the Corporation handles benefit

determinations and appeals of those determinations as follows:

> The PBGC makes initial determinations "with respect to allocation of assets under [29 U.S.C. § 1344]." 29 C.F.R. § 4003.1(b)(4). They are issued in writing and must "state the reason for the determination." Id. § 4003.21. "Any person aggrieved by an initial determination . . . may file an appeal," id. § 4003.51, to be considered by the PBGC Appeals Board, which is composed of three PBGC officials, id. § 4003.2. In a written appeal, appellants can request to appear before the Board and present witnesses to testify before the Board. Id. § 4003.54. The Board has discretion to reject such requests. Id. § 4003.55(b). A decision issued by the Appeals Board "constitutes the final agency action by the PBGC with respect to the determination which was the subject of the appeal." Id. § 4003.59(b).

Davis II, 734 F.3d at 1166 (alterations in original).

## B.      Factual Background

The plaintiffs in this case, former Delta pilots (or their beneficiaries), are participants or

beneficiaries under the Plan, which is a single-employer, tax-qualified deferred benefit plan.

Lewis v. PBGC, 197 F. Supp. 3d 16, 19 (D.D.C. 2016) (Walton, J.). The relevant facts regarding

the Plan and the Corporation's actions taken with respect to the Plan are set forth below.

### 1.      The Plan's Compensation Limit

On June 21, 2001, two weeks after the EGTRRA was passed, see Pub. L. No. 107-16,

§ 611(c)(1), 115 Stat. at 38, Delta and the "pilots in the service of Delta[,] . . . as represented by

the Air Line Pilots Association, International" (the "ALPA"), signed the Pilots Working

Agreement (the "PWA"), a collective bargaining agreement that updated the Plan, see AR 3411–

12. The PWA provides that any statutory increase to the compensation limit "will be

effective for the . . . [Plan] as of the earliest date that the increased [q]ualified [p]lan [l]imits

could have become legally effective for that Plan, had that Plan not been collectively bargained,"

AR 3697, and that the provision "will be effective on September 1, 2001," AR 3695.

On June 27, 2003, Delta signed the Fourth Amendment to the Delta Pilots Retirement Plan As Amended and Restated Effective July 1, 1996 (the "Fourth Amendment"). See AR 244, 251. The Fourth Amendment, which states that it is "[e]ffective July 1, 2002, or such other effective date as may be provided in a provision below," explains that its purpose is "to reflect certain provisions of . . . [the] EGTRRA," and that it "is intended as good faith compliance with the requirements of [the] EGTRRA and is to be construed in accordance with [the] EGTRRA and guidance issued thereunder." AR 244. To that end, the Fourth Amendment adds the following paragraph to the Plan:

> The Earnings taken into account in determining benefit accruals of an Employee in any Plan Year beginning after June 30, 2002 shall not exceed $200,000 . . . . In determining benefit accruals of [retired e]mployees . . . in Plan Years beginning after June 30, 2002, the annual compensation limit provided in this paragraph for Plan Years beginning before July 1, 2002 shall be $200,000, or, if greater, the annual compensation limit in effect under Section 401(a)(17) of the Code for that Plan Year . . . .

AR 245.

### 2. The Plan's Qualified Benefit Limit

The PWA provision governing the qualified benefit limit also governs the compensation limit, and states that any statutory increase to the qualified benefit limit "will be effective for the . . . [Plan] as of the earliest date that the increased [q]ualified [p]lan [l]imits could have become legally effective for that Plan, had that Plan not been collectively bargained," AR 3697, and that the provision "will be effective on September 1, 2001," AR 3695.

The Fourth Amendment amended the Plan to incorporate the EGTRRA's increase in the qualified benefit limit as follows:

> Benefit increases resulting from the increase in the limit of Section 415(b) of the [Tax] Code under [the] EGTRRA shall be provided to all current and former participants (with benefits limited by Section 415(b)) who have an accrued benefit under the Plan immediately prior to July 1, 2001 (other than an accrued benefit

8

resulting from a benefit increase solely as a result of the increases in limitations under Section 415)); provided, however, that such increase shall only be applied to the annuity payments made from this Plan to former participants on or after July 1, 2002.

AR 248. The Fourth Amendment also provided that it

shall be effective with the [Plan] year starting on July 1, 2001 for those Employees whose Annuity Starting Date is on or after July 1, 2001. With respect to [p]articipants whose Annuity Starting Date was before July 1, 2001, the increased 415 limit . . . shall be effective for annuity payments made on or after July 1, 2002.

AR 248.

### 3. Bankruptcy Proceedings and Letter of Agreement #51

In September 2005, Delta filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). AR 6. Thereafter, the Corporation determined that the Plan had insufficient assets to cover its guaranteed benefit liabilities as of the proposed date of the Plan's termination. AR 7. In the course of the bankruptcy proceedings, Delta negotiated with the ALPA regarding the Plan's termination and the benefits that non-retired Delta pilots (the "Active Pilots" ) would receive, which resulted in the execution of Letter of Agreement #51. See AR 932. Upon approval by the Bankruptcy Court, Letter of Agreement #51 would modify the PWA by requiring Delta to issue $650 million in senior unsecured notes to the ALPA (the "ALPA Notes"), "[i]n the event the . . . Plan is terminated," AR 968, for the ALPA's distribution among its members, see AR 971 (noting that "[d]istribution mechanics, eligibility and allocation [of the ALPA Notes] among such pilots or pilot accounts [would] be determined by [the] ALPA"). Letter of Agreement #51 also provided the ALPA with a "general non-priority unsecured claim . . . in the amount of $2.1 billion (the 'ALPA Claim')," AR 967, to be allocated among the Active Pilots by the ALPA's Delta Master Executive Council, see AR 966–67.

The Corporation objected to Delta's motion for the Bankruptcy Court to authorize the execution of Letter of Agreement #51 on the grounds that the agreement would violate the ERISA. <u>See</u> AR 1050. The Corporation's objections were based on its position that the ALPA Notes and the ALPA Claim (collectively, the "ALPA Payments") were intended "to replace unfunded benefits under the Pilots Plan by using the proceeds to fund follow-on retirement plans and other payments or distributions to pilots." AR 1049. The Corporation argued that the ALPA Notes were intended to serve as replacement payments for Plan benefits because Letter of Agreement #51 "provides to the [A]ctive [P]ilots $650 million in notes <u>if and only if</u> the Pilots Plan terminates," AR 1064, and "the ALPA claim is clearly intended to make up for some portion of the [A]ctive [P]ilots' pension benefits lost as a result of the Pilots Plan termination" because Letter of Agreement #51 permits the proceeds of the ALPA Claim (as well as the ALPA Notes) to be received "as retirement benefits—<u>i.e.</u>, on a pre-tax and tax-deferred basis," AR 1068.

The Corporation objected to the execution of Letter of Agreement #51 because the ALPA Payments would violate the "ERISA's explicit statutory provision assigning the claim for a pension plan's <u>total</u> underfunding exclusively to [the] PBGC, and . . . [would] establish[] a follow-on arrangement to replace benefits under the Pilots Plan that may be abusive of the pension insurance system." AR 1049–50. The Corporation explained in its objections that the total amount of unfunded guaranteed benefits that it can pay to beneficiaries "depends on the amount [it] recovers for unfunded benefit liabilities from the plan sponsor and its controlled group." AR 1053. And, if Letter of Agreement #51 were executed, the Active Pilots "would recover [u]nfunded [n]onguaranteed [b]enefits from both the employer," in the form of the ALPA Payments, and from the Corporation once it became Plan trustee upon the Plan's

termination, which would constitute an improper double recovery that "would be distributed contrary to the [ERISA] statutory scheme." AR 1064.

The Bankruptcy Court overruled the Corporation's objections to Letter of Agreement #51, finding no "sufficient basis . . . to reach the conclusion that [Letter of Agreement #51] infringes any provision of law or any legal ruling by a Court," AR 453, and authorized Delta and the ALPA to execute Letter of Agreement #51, see AR 1091, 1093. The Corporation initially noted an appeal of the Bankruptcy Court's ruling, see AR 1099–1102, but subsequently dismissed that appeal, AR 1153, after entering into a settlement agreement with Delta, AR 1105. In that settlement agreement, the Corporation received a "prepetition, general, non-priority unsecured claim against Delta . . . in the amount of $2.2 billion." AR 1105; see also AR 1126, 1130.

## 4. The Corporation's Allocations and Benefit Determinations

In December 2006, Delta and the Corporation executed an agreement appointing the Corporation as the Plan trustee and terminating the Plan as of September 2, 2006. See AR 5436–38. The Corporation valued the Plan's assets at approximately $1.984 billion and its liabilities at approximately $4.552 billion. See AR 848, 877. The Corporation also allocated the "plan liabilities by priority category" pursuant to the ERISA's statutory scheme. See AR 877; see also 29 U.S.C. § 1344(a). The Corporation's allocations and benefit determinations that are the subject of the plaintiffs' claims in this case are explained in further detail below.

### a. The Increased Compensation Limit

The Corporation determined that the increased compensation limit established by the EGTRRA in 2001, which was incorporated into the Plan through the PWA in 2001 and the Fourth Amendment in 2003, see AR 15, did not apply to its calculations of the plaintiffs' PC3

benefits because the increased compensation limit did not go into effect until the plan year beginning on July 1, 2002, see AR 13–14 ("Since the plan year for the Pilots Plan began on July 1 and ended on June 30, [the] $200,000 limit went into effect on July 1, 2002 (i.e., the first day of the plan year beginning after December 31, 2001)."), and the Plan terminated less than five years later, on September 2, 2006, see AR 2. Accordingly, because the ERISA requires a benefit to be in effect for five years prior to the date of the plan's termination in order to qualify as a PC3 benefit, see 29 U.S.C. § 1344(a)(3), the Corporation determined that the increased compensation limit did not apply to its calculations of the plaintiffs' PC3 benefits, see AR 16 ("[T]he benefit amount in PC3 is based on the plan provisions 'in effect' during the five years before the plan's termination date 'under which such benefit would be the least.'" (quoting 29 U.S.C. § 1344(a)(3))).

### b. The Increased Qualified Benefit Limit

The Corporation also determined that although the PWA incorporated the EGTRRA's increased qualified benefit limit into the Plan on July 1, 2001, more than five years prior to the Plan's termination, the PWA did so only for pilots who were active at that time, i.e., pilots "who had not retired or separated from service prior to . . . July 1, 2001." AR 22. However, for participants who retired before July 1, 2001, the Plan was not amended to incorporate the qualified benefit limit increase until the adoption of the Fourth Amendment in June 2003, which was less than five years prior to the Plan's termination. See AR 29–30. As a result, the Corporation applied the increased qualified benefit limit only for its calculations of the Active Pilots' PC3 benefits, and not for the plaintiffs' PC3 benefits. See AR 30.

### c. The Recovery Benefits

The "PBGC determined that the total value of its recoveries [from Delta] under the settlement was $1,279,506,423 as of May 3, 2007 (approximately [eight] months after [the Plan's termination])." AR 42. But, "[t]o reflect interest, [the] PBGC discounted th[at] value . . . by $50,501,683, resulting in a . . . recovery value of $1,229,004,740." AR 43. The Corporation allocated $240,263,310 to the Plan's assets, which "significantly increased the funded PC3 benefits that [the] PBGC pa[id] to PC3-eligible participants and beneficiaries . . . , which include[d] the [plaintiffs]," and allocated $988,741,430 to its unfunded benefit liabilities funds. AR 46.

For the unfunded benefit liabilities funds, the Corporation calculated the recovery ratio, i.e., "the percentage of the [P]lan's otherwise unfunded benefits that bec[a]me funded due to [the] [unfunded benefit liabilities] recovery," which was 38.51%. AR 47. The Corporation then multiplied the value of the Plan's unfunded benefit liabilities, as of the date of the Plan's termination, by the recovery ratio to arrive at a total figure of $681,259,882, which was used "to pay otherwise unfunded nonguaranteed benefits." See AR 47. That amount funded the remainder of the Plan's PC3 benefit liabilities, see AR 49 n.137, and almost 52% of the PC5(a) benefit liabilities, see AR 50. "[T]here were no remaining funds to allocate to [ ] PC5(b)." AR 50.

The Corporation determined that the increased compensation and qualified benefit limits, which it had already determined could not be applied to the plaintiffs' PC3 benefits, belonged in the PC5(b) category because those increases were not "in effect" for the full five-year period prior to the Plan's termination, as required for inclusion in PC5(a). See AR 48. Consequently,

because there were no remaining funds to allocate to PC5(b), the Corporation was unable to pay these increases. See AR 48.

### 5. The Appeals Board's Decision

After the Corporation issued final benefit determinations for the Plan's participants and beneficiaries, see AR 2, the plaintiffs filed a consolidated appeal with the PBGC Appeals Board raising thirteen issues, see AR 1, 3. On September 27, 2013, the Appeals Board issued its final agency decision. See AR 1. The Appeals Board's conclusions that are relevant to the plaintiffs' claims in this case are set forth below.

#### a. The ALPA Payments

The plaintiffs argued before the Appeals Board that the Corporation should have taken into account the ALPA Payments that the Active Pilots received pursuant to Letter of Agreement #51 by construing those payments as received pension benefits under the Plan. See AR 35–36, 40–41. The Appeals Board disagreed, reasoning that "[t]he ALPA Payments were not made from Plan assets and, thus, they were never funds that '[left] the Plan just before [the] PBGC assumed its role as statutory trustee.'" AR 36 (second alteration in original) (citation omitted). Therefore, the Appeals Board concluded that the "PBGC [wa]s not required to take the ALPA Payments into account in allocating the Plan's assets and [the] PBGC's recoveries." AR 36. As justification for its position, the Appeals Board explained:

> [The] ERISA does not require [the] PBGC to account for the ALPA Payments for purposes of allocating the Pilots Plan's assets and [the] PBGC's recoveries to the Plan's benefit liabilities. [29 U.S.C. § 1344(a)] provides that [the] PBGC, upon plan termination, "shall allocate the assets of the plan (available to provide benefits) among the participants and beneficiaries of the plan." [29 U.S.C. § 1322(c)] provides for [the] PBGC to allocate a portion of its recoveries under [29 U.S.C. § 1362] to benefit liabilities that are neither funded by plan assets nor guaranteed by [the] PBGC. The ALPA Payments were never Plan assets, nor were they funds that [the] PBGC recovered under Title IV of [the] ERISA.

> . . . Rather, the ALPA Payments are funds that were transferred directly from Delta to [the] ALPA pursuant to a court-approved collective bargaining agreement. Furthermore, the ALPA Payments did not change the pension liabilities owed by the Pilots Plan to its participants and beneficiaries as of the Pilots Plan's termination date.

AR 41 (footnotes omitted); see also AR 41 n.116 ("The mere fact that a participant received a payment from a source outside of a PBGC-trusteed plan does not establish that a pension liability under the terminated plan has been reduced or extinguished.").

### b. The Increased Compensation Limit

The plaintiffs argued before the Appeals Board that the Corporation should have applied the increased compensation limit in its calculations of their PC3 benefits because it "was incorporated into the Pilots Plan's provisions more than [five] years before the Pilots Plan terminated (i.e., before September 2, 2001)."  AR 12–13.  The Appeals Board disagreed, stating that the Corporation's regulation provides that a plan provision is "in effect" under 29 U.S.C. § 1344(a)(3)(A) "on the later of the date on which it is adopted or the date it becomes effective," 29 C.F.R. § 4044.13(b)(6) (2017), and it "becomes effective" on the date that it becomes "payable," see id. § 4044.13(b)(3)(i); see also AR 16.  And, "[b]enefit increases that were [in] effect[] throughout the [five]-year period" are included in PC3.  See AR 17 (quoting 29 C.F.R. § 4044.13(a)).  Therefore, the Appeals Board explained, "a benefit increase cannot be 'in effect' for purposes of PC3 before the date on which the increase becomes operative[,] . . . even if the plan provision that provided for the increase has an earlier 'stated' effective date."  AR 16. "Thus, if a benefit increase does not go into effect (i.e., is not payable) until after [five years before the plan's termination] and if a participant's payable PC3 benefit amount would be lower based on the plan provisions that were in effect before the increase, then the increase is not included in the participant's PC3 benefit."  AR 17.

The Appeals Board concluded that the Corporation correctly applied its regulation to the Plan as follows: (1) the adoption date of the Plan provision incorporating the increased compensation limit was June 21, 2001, the date the PWA was signed, see AR 245; see also AR 3412, 3697; (2) the PWA's stated effective date for the increased compensation limit was September 1, 2001, see AR 3695, 3697; and (3) the increased compensation limit became payable on July 1, 2002, because the Plan incorporated the $200,000 limit "for purposes of 'determining benefit accruals of an [e]mployee in any [p]lan [y]ear beginning after June 30, 2002,'" AR 17 (quoting AR 245). Therefore, the Appeals Board affirmed that the increased compensation limit was "in effect" on July 1, 2002, because that was the date when any increase in benefits would become payable. See AR 17. And, because that date occurred after five years before the Plan's termination, those increased benefits could not be included in PC3. See AR 17. The Appeals Board noted that another member of this Court had "upheld [the] PBGC's interpretation of [the] ERISA's PC3 provisions as a 'permissible construction of the statute,'" AR 18 (citing Davis v. PBGC, 864 F. Supp. 2d 148, 157 (D.D.C. 2012)), which the Circuit subsequently affirmed after the Appeals Board's decision was issued, see Davis II, 734 F.3d at 1168 ("The statutory phrase 'in effect' . . . is ambiguous, and the PBGC has interpreted it . . . to mean 'payable.'"). Thus, the Appeals Board affirmed the Corporation's conclusion that the increased compensation limit should not be applied to the calculations of the plaintiffs' PC3 benefits. See AR 18.

### c.       The Increased Qualified Benefit Limit

The plaintiffs further argued before the Appeals Board that, although the Corporation "correctly determined" that the PWA constituted a Plan amendment that was adopted and effective five years prior to the Plan's termination, the Corporation erred in concluding "that the

increased [qualified benefit] limit under the PWA applied 'only for those pilots who were active at the time the [ ] PWA was signed.'" AR 28 (citation omitted). The Appeals Board disagreed, stating that "based on [the] ERISA, [the] PBGC regulations, and the Pilots Plan's provisions, [ ] [the] PBGC applied the appropriate [qualified benefit] limits when it determined PC3 benefits for the [plaintiffs] and for the [A]ctive [P]ilots." AR 23.

The Appeals Board reasoned that the PWA did not amend the Plan for retired pilots because the PWA: (1) is defined as "the basic collective bargaining agreement between Delta Air Lines, Inc. and the air line pilots in the service of Delta Air Lines, Inc.[,] as represented by the Air Lines Pilots Association International," AR 28; (2) "states that it 'cover[s] the pilots in the employ of the Company,'" AR 28 (alteration in original); and (3) "defines 'Pilot' as 'an employee of Delta Air Lines, Inc. whose name appears on the Delta Air Lines Pilots' System Seniority List,'" AR 28. The Appeals Board noted that "the law does not presume that a collective bargaining agreement covers retired employees," AR 29 ("To the contrary, the Supreme Court has found that, '[s]ince retirees are not members of the bargaining unit, the bargaining agent is under no statutory duty to represent them in negotiations with the employer." (quoting Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n.20 (1971))), and "found insufficient evidence to establish that [the] ALPA was representing the interests of retired pilots when it negotiated [the] PWA," AR 29.

The Appeals Board pointed to the Fourth Amendment as further support for its conclusion that the PWA did not apply to retired pilots. See AR 29. It concluded that, under the Fourth Amendment, the qualified benefit limit increases were effective for Active Pilots as of July 1, 2001, but were not effective for retired pilots until July 1, 2002, see AR 25, because "the Fourth Amendment provides that benefit increases resulting from [the] EGTRRA's amendment

of the [qualified benefit] limit are effective on different dates depending on the employee's

Annuity Starting Date ('ASD')," AR 25 n.69.  The Plan defines an employee's ASD as "the first

day of the first period for which a retirement benefit is paid as an annuity," and therefore,

according to the Appeals Board, "a pilot's ASD is on or after his or her retirement date."  AR 25

n.69.  Because the Fourth Amendment provides that the qualified benefit limit increases "were

effective July 1, 2001 for employees with ASDs 'on or after July 1, 2001,'" i.e., for Active

Pilots, "and were effective on July 1, 2002 for employees with ASDs 'before July 1, 2001,'" i.e.,

for retired pilots, AR 25 n.69, the Appeals Board found that "the Fourth Amendment's

establishment of different effective dates for the two groups of participants is significant with

respect to the Board's resolution of [PC3 benefits]," AR 25–26.  As the Appeals Board

recognized, "[t]he Fourth Amendment explicitly provides for different effective dates for the

[qualified benefit] limit increase depending upon the ASD," and therefore, "is wholly consistent

with the PWA only if . . . the PWA does not amend the [qualified] benefit limit for retired

pilots," because "[o]therwise, there would be a clear conflict between the 'earliest effective date'

language in the PWA and the delayed effective date for the retired pilots in the Fourth

Amendment."  AR 29.

Based on these reasons, the Appeals Board concluded that the "PBGC correctly

determined that the retired pilots are not entitled to have their PC3 benefits computed based on

the [increased qualified benefit] limit under [the] EGTRRA" because the "Fourth Amendment,

which provided the [qualified benefit] limit increase to the retired pilots, was adopted on June

27, 2003," and provided that "the retired pilots could not receive payments based on the

increased [qualified benefit] limit . . . until July 1, 2002."  AR 30.  Due to the fact that both of

these dates were less than five years before the Plan's termination, AR 30, the Appeals Board

found that, "[f]or the retired pilots, the plan provision that provides the lowest annuity benefit payable during the five-year period before [the Plan's termination]," as required by Corporation regulation, "is the benefit provision in effect between September 1, 2001[,] and June 30, 2002." AR 30.

### d.   The Recovery Funds

The plaintiffs argued before the Appeals Board that the "PBGC made an error of 'simple arithmetic' when it allocated the funds it recovered from Delta and related entities after Plan termination." AR 42. The Appeals Board found no error, explaining that the Corporation properly discounted the value of its recovery as of May 3, 2007, which was $1,279,506,423, by $50,501,683, to reflect the value of its recovery as of the date of the Plan's termination. See AR 43.

The plaintiffs also argued that the Corporation incorrectly allocated the compensation and qualified benefit limit increases to PC5(a) instead of to PC5(b). See AR 42; see also AR 48 ("The [plaintiffs' a]ppeal contends that [the] PBGC's [§ 1322(c)] allocation was improper because it did not accord priority within PC5 to [the compensation] and [qualified benefit] limit increases."). The Appeals Board disagreed, concluding "that the same rules governing when a plan provision or amendment is 'in effect' for purposes of determining the PC3 benefit and applying the phase-in limit should be applied in assigning benefits to the PC5 subcategories." AR 51.

## II.   ANALYSIS

### A.   The Applicable Standard of Review

As an initial matter, the parties disagree as to what standard the Court should apply in reviewing the Corporation's determinations of the plaintiffs' benefits under the Plan. The

plaintiffs argue that the standard of review should be <u>de novo</u> because "[a] court reviews an ERISA fiduciary's 'statutory and legal conclusions de novo,'" Pls.' Mem. at 12 (quoting <u>Brown v. Cont'l Airlines, Inc.</u>, 647 F.3d 221, 226 (5th Cir. 2011)), and that the Court should not apply the two-step process the Supreme Court adopted in <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984), or any other "form of administrative-law type of deference," <u>see id.</u> The Corporation argues in response that "[b]oth the Supreme Court and the [District of Columbia] Circuit have made clear" that the <u>Chevron</u> framework applies to its interpretations of the ERISA. Def.'s Mem. at 12–13 (first citing <u>Mead Corp. v. Tilley</u>, 490 U.S. 714, 722, 726 (1989); then citing <u>LTV Corp.</u>, 496 U.S. at 650–51; then citing <u>Beck v. Pace Int'l Union</u>, 551 U.S. 96, 104 (2007); and then citing <u>Davis v. PBGC</u>, 571 F.3d 1288, 1293 (D.C. Cir. 2009) ("<u>Davis I</u>")).

### 1.  Whether the <u>Chevron</u> Framework Applies

The law in this Circuit is clear that the <u>Chevron</u> framework applies to the Corporation's interpretations of the ERISA. At least eight different Supreme Court and District of Columbia Circuit opinions support this conclusion.[4] <u>See</u> <u>Beck</u>, 551 U.S. at 97 ("The Court has traditionally

---

[4] In addition, several decisions authored by members of this Court have held that the <u>Chevron</u> framework applies to the Corporation's interpretations of the ERISA. <u>See, e.g.</u>, <u>PBGC v. Asahi Tec Corp.</u>, 979 F. Supp. 2d 46, 70 (D.D.C. 2013) ("Under Chevron step two, the Court finds [the] PBGC's interpretation to be reasonable."); <u>Quality Auto. Servs., LLC v. PBGC</u>, 960 F. Supp. 2d 211, 217 (D.D.C. 2013) ("Thus, far from being 'manifestly contrary to the statute,' [the] PBGC's interpretation represents a reasonable reading of the statute." (quoting <u>Chevron</u>, 467 U.S. at 844)); <u>Vanderkam v. PBGC</u>, 943 F. Supp. 2d 130, 145 (D.D.C. 2013) ("[The] PBGC's interpretation is a permissible construction of the statute and should be accorded deference under <u>Chevron</u> [s]tep [t]wo."); <u>Davis v. PBGC</u>, 864 F. Supp. 2d 155 ("[T]he Court will apply <u>Chevron</u> deference to those claims in which [the p]laintiffs challenge [the] PBGC's interpretations of ambiguous ERISA provisions."); <u>Brown v. PBGC</u>, 821 F. Supp. 26, 31 (D.D.C. 1993) ("The Court has found that the [d]efendant's interpretation of [the] ERISA's substantial owner restrictions is consistent with the plain language of the statute. However, assuming arguendo that an ambiguity exists in the statute, the Court would nonetheless have to reject the [p]laintiff's interpretation of [the] ERISA. When an agency interprets an ambiguous statutory provision, the second prong of <u>Chevron</u> . . . mandates that the Court uphold an agency's decision under that provision so long as that interpretation is a reasonable one."); <u>see also</u> <u>Rettig v. PBGC</u>, 744 F.2d 133, 140–41, 150, 155 (D.C. Cir. 1984) (employing the <u>Chevron</u> framework, but determining that the Corporation's interpretation of the statute was not reasonable under step two because it "d[id] not represent 'a reasonable accommodation of conflicting policies . . . committed to the agency's care by the statute'" (second alteration in original) (quoting <u>Chevron</u>, 467 U.S. at 845)); <u>Fisher v. PBGC</u>, 151 F. Supp. 3d 159, 167–69 (D.D.C.

(continued . . . )

20

deferred to the PBGC when interpreting [the] ERISA."); LTV Corp., 496 U.S. at 648 ("Here, the

PBGC has interpreted [29 U.S.C. § 1347] as giving it the power to base restoration decisions on

the existence of follow-on plans.  Our task, then, is to determine whether any clear congressional

desire to avoid restoration decisions based on successive pension plans exists, and, if the answer

is in the negative, whether the PBGC's policy is based upon a permissible construction of the

statute."); Tilley, 490 U.S. at 722 (applying Chevron deference to the Corporation's

interpretation of the ERISA provision at issue, as expressed in its amicus brief); Page v. PBGC,

968 F.2d 1310, 1313–14  (D.C. Cir. 1992) ("Our initial question, as instructed by the Supreme

Court's 1984 leading decision in Chevron, is whether Congress had a specific intent regarding

the matter at hand. . . .  If it appears, however, that 'Congress did not actually have an intent'

regarding the statutory construction question at issue, we will uphold a reading by [the

Corporation,] the agency entrusted with the statute's administration[,] if the agency's reading

'represents a reasonable accommodation of conflicting policies [Congress] committed to the

agency's care.'" (fourth alteration in original) (quoting Chevron, 467 U.S. at 845)); Rettig v.

PBGC, 744 F.2d 133, 141 (D.C. Cir. 1984) ("We are initially confronted with the familiar task of

reviewing an agency's construction of the statute it is charged with implementing, a task which

of course we undertake with due deference to the agency's congressional mandate and

expertise." (citing Chevron, 467 U.S. at 837)); Belland v. PBGC, 726 F.2d 839, 843 (D.C. Cir.

1984 ("[The] PBGC's interpretation of [the] ERISA is entitled to great deference."); see also

---

( . . . continued)

2016) (declining to decide whether "the Appeals Board's decision would ordinarily warrant Chevron deference"
because "it is clear that the Appeals Board's decision in this case does not.  An agency's unreasoned adjudication of
a question of law does not warrant deference of any sort," and in that case, "[t]he Appeals Board's decision suggests
that the PBGC read[] the statute to permit such a result[, b]ut the decision does not explain why" (internal citations
and quotation marks omitted)); Ass'n of Flight Attendants–CWA, AFL–CIO v. PBGC, No. 05-1036 (ESH), 2006
WL 89829, at *7 (D.D.C. Jan. 13, 2006) (employing the Chevron framework, but "conclud[ing] that [the] PBGC's
reliance on the Agreement in deciding to terminate the [ ] Plan is not a 'permissible construction' of § 1342(a)(4)"
under step two (quoting Chevron, 467 U.S. at 842–43)).

Deppenbrook v. PBGC, 778 F.3d 166, 172 (D.C. Cir. 2015) ("Had the PBGC Appeals Board offered its statutory interpretation in its decision-letter to Deppenbrook, that interpretation would likely be subject to the two-step Chevron framework."); Boivin v. U.S. Airways, Inc., 446 F.3d 148, 156 (D.C. Cir. 2006) ("The pilots concede that the PBGC's interpretations of the relevant statutory and regulatory provisions are entitled to judicial deference, and that we must uphold them if they are reasonable.").

The plaintiffs argue that of the three Supreme Court cases cited above—Beck, LTV Corp., and Tilley—"two [LTV Corp. and Tilley] . . . are outdated, the third [Beck] . . . is inapposite, and all . . . are distinguishable on their facts." Pls.' Reply at 3; see also id. at 3–4 ("The Corporation nowhere acknowledges the sea change that took place in the field of administrative law when the Supreme Court decided United States v. Mead Corp., 533 U.S. 218 (2001).").[5] According to the plaintiffs, the Supreme Court decided in Mead Corp. that "informal agency decisions, such as the informal adjudication at issue here, would no longer be presumptively entitled to Chevron deference." Id. at 4.

The Court disagrees with the plaintiffs' assertion that LTV Corp. and Tilley are no longer good law after Mead Corp., and that Beck does not apply here. In Mead Corp., the Supreme Court held that "a tariff classification ruling by the United States Customs Service . . . ha[d] no claim to judicial deference under Chevron, there being no indication that Congress intended such a ruling to carry the force of law." 533 U.S. at 221. Instead, the Court "h[e]ld that under Skidmore v. Swift & Co., 323 U.S. 134 (1944), the ruling is eligible to claim respect according to its persuasiveness." Id. The Court explained that

---

[5] The plaintiffs do not address the Circuit's decisions in Belland, Deppenbeck, or Boivin at all, see Pls.' Mem. at iii–vi (not listing these cases in the Table of Authorities); Pls.' Reply at iii–vii (same), and mention Rettig only in their discussion of Claim 5 of the First Amended Complaint, see Pls.' Reply at 37. The plaintiffs' argument regarding the Circuit's decisions in Page, Davis I, and Davis II are explored infra.

administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

Id. at 226–27; see also id. at 230 ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."). The Court noted that "as significant as notice-and-comment rulemaking is in pointing to Chevron authority, the want of that procedure [ ] does not decide the [question], for we have sometimes found reasons for Chevron deference even when no such administrative formality was required and none was afforded." Id. at 230–31; see also id. at 231 ("The fact that the tariff classification here was not a product of such formal process does not alone, therefore, bar the application of Chevron."). The Court in Mead Corp. found that the statute itself "g[a]ve no indication that Congress meant to delegate authority to Customs to issue classification rulings with the force of law," id. at 231–32, and therefore concluded that "to claim that [such] classifications have legal force is to ignore the reality that [forty-six] different Customs offices issue 10,000 to 15,000 of them each year," id. at 233. Therefore, "Mead Corp. . . . requires that, for Chevron deference to apply, the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted." City of Arlington, Tex. v. FCC, 569 U.S. 290, 306 (2013).

The Court is not persuaded that, after Mead Corp., the Chevron framework no longer applies to the Corporation's its interpretations of the ERISA made through its benefit determinations. Notably, the Supreme Court's decision in Beck was issued six years after Mead

Corp., and in that case, the Supreme Court chose, once again, to defer to the Corporation's interpretations of the ERISA as articulated in an amicus brief. See Beck, 551 U.S. at 103–04. In Beck, the Court, was tasked to decide whether merger was "a permissible form of plan termination under [the] ERISA." Id. at 102 (emphasis removed). The Court noted that, in order "[t]o affirm the [decision below], [it] would have to decide that merger is a permissible method" of plan termination under the statute, id. at 103–04, and it "would have to do that over the objection of the PBGC, which . . . t[ook] the position that [the applicable statutory provision] does not permit merger as a method of termination because (in its view) merger is an alternative to (rather than an example of) plan termination," id. at 104. The Court noted that it has "traditionally deferred to the PBGC when interpreting [the] ERISA, for 'to attempt to answer these questions without the views of the agencies responsible for enforcing [the] ERISA, would be to embar[k] upon a voyage without a compass.'" Id. (first quoting Tilley, 490 U.S. at 722, 725–26; then citing LTV Corp., 496 U.S. at 648, 651).

The plaintiffs argue that in Beck, "the Court did not grant (or even discuss) Chevron deference[, which, according to the plaintiffs,] is unsurprising given that Beck, unlike Tilley, was issued after the Court's landmark decision in . . . Mead Corp." Pls.' Reply at 5. Although the plaintiffs are correct that the Court did not actually use the word "Chevron" in its discussion of the deference it afforded to the Corporation's interpretations of the ERISA, in the Court's view, the Supreme Court's statement in Beck that "[w]e have traditionally deferred to the PBGC when interpreting [the] ERISA," see 551 U.S. at 104, is a reference to the Chevron framework, see Cuomo v. Clearing House Ass'n, LLC, 557 U.S. 519, 525 (2009) ("Under the familiar Chevron framework, we defer to an agency's reasonable interpretation of a statute it is charged with administering."), and thus shows that the Supreme Court continues to apply the Chevron

framework to the Corporation's statutory interpretations of the ERISA.  Furthermore, the

Supreme Court in Beck, an opinion decided after Mead Corp., cited approvingly Tilley and LTV

Corp. in support of its decision that it would continue to defer to the Corporation's statutory

interpretations of the ERISA.  See id. Consequently, the Court is convinced that the Chevron

framework continues to apply to the Corporation's statutory interpretations of the ERISA, even

after the Supreme Court's decision in Mead Corp.[6]

Notwithstanding the precedent discussed above, the plaintiffs assert four additional

reasons why the Chevron framework does not apply to the Corporation's statutory interpretations

of the ERISA under the facts of this case.  The Court will consider each reason in turn.

### i.    Whether the Appeals Board's Decision Was a Policy Matter

First, the plaintiffs argue that because "the legal interpretations of [the] ERISA at issue

here directly affect thousands of participants in this Plan and, as a matter of precedent, thousands

more in other plans," the Appeals Board's decision constitutes a "'policy matter' that stands to

'have a significant impact' on Title IV's 'stakeholders,'" and, as a result, "is reserved to the

Corporation's Board of Directors, and cannot be delegated."  Pls.' Mem. at 12–13 (citation

omitted).  According to the plaintiffs, because the Appeals Board, and not the Board of

Directors, issued the decision here, under the Circuit's decision in Page, "the Corporation failed

---

[6] The plaintiffs argue that that "[w]hile some interpretations offered through informal means may still warrant Chevron deference, it is well settled that those offered through amicus briefs (as in Tilley) do not."  Pls.' Reply at 5. As an initial matter, whether the Chevron framework applies to the Corporation's views as expressed in an amicus brief is not the issue in this case because the Corporation's views were expressed through the Appeals Board's decision.  In any event, the decisions that the plaintiffs cite in support for the purportedly "well settled" proposition (that the Chevron framework does not apply to an agency's statutory interpretation as stated in an amicus brief) are decisions from the Second, Ninth, and Sixth Circuits, see id., none of which constitute binding authority on this Court.  Moreover, in the Supreme Court's decision in Beck, which was issued six years after Mead Corp., the Supreme Court deferred to the Corporation's interpretations of the ERISA as expressed in an amicus brief.  See Beck, 551 U.S. at 103–04.

to 'engage in decision-making of the character required by the Corporation's regulations,' in order to make Chevron deference appropriate." Id. at 13 (quoting Page, 968 F.2d at 1315).

In Page, as the Court noted above, the Circuit, employing the two-part Chevron analysis, concluded "that Congress did not 'precisely address' the issue before [the Circuit]" under step one, and therefore considered under step two whether "the PBGC's interpretation of the original [statutory provision] [was] a reasonable one in view of the policies that underlie [the] ERISA." 968 F.2d at 1315. The Circuit "conclude[d] that the PBGC did not engage in decisionmaking of the character required by the Corporation's regulations," namely, the Corporation's bylaws precluding the Board of Directors from delegating a "[f]inal decision on any policy matter that would materially affect the rights of a substantial number of employees or covered participants and beneficiaries." Id. (citing 29 C.F.R. § 2601.3(b)(5)).[7] The Circuit decided that the matter at issue in Page, "whether unlawful vesting terms retained in a plan could eliminate the PBGC's obligation to guarantee benefits," id. at 1314, constituted a policy matter under the bylaws because "thousands of plans, and hence a significant number of participants covered under Title I, [we]re potentially affected by the Corporation's interpretation of [the statutory provision] as originally enacted," id. at 1316. Therefore, because the Corporation's Board of Directors had not issued a final decision on the matter, the Circuit remanded the case to the district court "to invite the Board [of Directors'] first-instance decision." Id.

Upon review of Page, the Court agrees with the Corporation, see Def.'s Mem. at 14, that Page is distinguishable from the circumstances here. In Page, the Circuit was assessing a

---

[7] 29 C.F.R. § 2601.3(b)(5) no longer exists, as the Corporation's bylaws are now located in 29 C.F.R. part 4002. The regulation analogous to the earlier version, now 29 C.F.R. § 4002.1(a)(3)(v), provides that the Board of Directors "may not delegate . . . [a]pproval of any policy matter (other than administrative policies) that would have a significant impact on the pension insurance program."

Corporation decision that would "potentially affect[]" "thousands of plans." See 968 F.2d at 1316; see also id. at 1311 (explaining that the plans at issue "had not been amended prior to termination to reflect the mandatory vesting provisions set out in [the] ERISA Title I"). Here, on the other hand, the plaintiffs challenge the Corporation's conclusions with regard to a single plan.

Furthermore, the Court is not convinced by the plaintiffs' argument, see Pls.' Reply at 7, that the large number of participants and beneficiaries that stand to be impacted by the Corporation's decision here, see Am. Compl. ¶ 1, transforms the Corporation's benefits determinations under the Pilots' Plan into a policy matter under the bylaws. The plaintiffs have not identified, see Pls.' Mem. at 12–13; Pls.' Reply at 6–8, nor could the Court locate, a single case, other than Page, in which a court determined that a decision made by the Corporation constituted a policy decision that, under the bylaws, could only be made by the Corporation's Board of Directors. Accordingly, the Court concludes that the Corporation's benefits determinations here do not constitute a non-delegable policy matter under 29 C.F.R. § 4002.1(a)(3)(v), and therefore, the holding in Page does not preclude the Court from applying the Chevron framework in this case.[8]

---

[8] The plaintiffs also argue that the Appeals Board's decision "illustrates overtly how the Corporation uses its appeals decisions to make and extend policy." Pls.' Reply at 7. The plaintiffs note that the Appeals Board cited its prior decision in Davis, and argue that, "if affirmed here, the Corporation will cite its legal determinations in this case as precedent for future decisions." Id. Therefore, according to the plaintiffs, "[w]hat the Corporation is up to is incremental policy-making through informal adjudication . . . and is owed no deference by the courts (in light of its own regulations and Page), absent approval by the Board of Directors." Id. The Court is not persuaded that the Appeals Board's reliance on its prior decisions, without the Board of Directors' approval, makes the Chevron framework inapplicable. To the contrary, it would be arbitrary and capricious for the Appeals Board to not consider its precedent. See Friedman v. Sebelius, 686 F.3d 813, 828 (D.C. Cir. 2012) ("The [agency's] decision . . . was arbitrary and capricious with respect to [the determination at issue] because it failed to explain its departure from the agency's own precedents."); see also Williams Gas Processing–Gulf Coast Co. v. FERC, 373 F.3d 1335, 1341 (D.C. Cir. 2004) ("[W]e will not countenance an agency's departure from its precedent without explanation . . . .").

### ii. Whether the <u>Chevron</u> Framework Applies to the Corporation's Interpretations of the ERISA as Trustee

Second, the plaintiffs argue that "the Corporation's interpretations concerning the asset allocation process were undertaken by the Corporation in its fiduciary role as statutory <u>trustee</u>, not as Title IV regulator or even guarantor, and thus they fall outside the scope of <u>Chevron</u> deference," Pls.' Mem. at 13, because they did not constitute an exercise of authority to "make rules carrying the force of law" delegated to it by Congress, <u>see</u> <u>id.</u> (quoting <u>Fogo de Chao (Holdings) Inc. v. DHS</u>, 769 F.3d 1127, 1136–37 (D.C. Cir. 2014)); <u>see also</u> Pls.' Reply at 4 (same). The Corporation argues that in <u>Davis I</u>, the Circuit "expressly rejected" the plaintiffs' argument that the Corporation's asset allocation decisions as trustee do not merit <u>Chevron</u> deference, and therefore, the Court should reject that argument here. <u>See</u> Def.'s Mem. at 15.

In <u>Davis I</u>, the plaintiffs, retired U.S. Airways pilots and their beneficiaries (the "U.S. Airways pilots"), appealed the district court's denial of their motion for a preliminary injunction "to prohibit the PBGC from implementing its benefits determinations while the[ir] suit [challenging those determinations] [wa]s pending." 571 F.3d at 1290. In that case, like here, "the PBGC was appointed to serve as trustee of the [U.S. Airways pilots'] retirement plan," <u>id.</u> at 1291, and, also like here, the U.S. Airways pilots argued that <u>Chevron</u> deference "should not apply . . . when the PBGC is acting as trustee rather than guarantor," <u>id.</u> at 1293. The Circuit rejected the U.S. Airways pilots' argument, concluding:

> We see no reason to depart from the usual deference we give to an agency interpreting its organic statute. The pilots point out that a private party serving as trustee would not receive <u>Chevron</u>-deference, but this point proves nothing. Unlike a private trustee, the PBGC has unique experience and "practical agency expertise" in interpreting [the] ERISA. The PBGC is therefore "better equipped" to interpret [the] ERISA than courts, and it is for this reason we defer to the PBGC's authoritative and reasonable interpretations of ambiguous provisions of [the] ERISA.

Id. (quoting LTV Corp., 496 U.S. at 651).  Thereafter, the district court entered summary judgment to the Corporation regarding the U.S. Airways pilots' plan, which a different Circuit panel affirmed in Davis II.  See 734 F.3d at 1164.

In Davis II, the Circuit determined that it "need not resolve the parties' contentions regarding whether the PBGC is entitled to deference pursuant to Chevron . . . when it acts as the trustee in an involuntary retirement plan termination," because in that case, "[r]egardless of the standard of deference, the [U.S. Airways p]ilots' claims relating to the PBGC's interpretation of the statute and regulations must fail."  Id. at 1167.  As a result, the Circuit also declined to "decide whether the decision in Davis [I], regarding the Pilots' request for a preliminary injunction, is the law of the case on the standard of review."  Id. (citing Sherley v. Sebelius, 689 F.3d 776, 783 (D.C. Cir. 2012)).

Regarding the Davis II decision, the Corporation contends that "[a]lthough the D.C. Circuit held . . . that it 'need not' resolve the level of deference to apply [to the Corporation], it did not reject or modify the earlier holding in [Davis I]."  Def.'s Mem. at 13 n.7; see also Def.'s Reply at 4–5 (same).  The plaintiffs disagree, contending that the standard of review is still an open question, despite the Circuit's ruling in Davis I, because "[r]ulings involving challenges to preliminary injunctions, when not made after the full briefing on the merits typical of an ordinary appeal, are not stare decisis."  Pls.' Mem. at 13 n.7 (first citing Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958); then citing Nat'l Org. for Women, Wash., D.C. Chapter v. Social Sec. Admin., 736 F.2d 727, 744 n.154 (D.C. Cir. 1984) (Robinson, J., concurring)); see also Pls.' Reply at 6 (same).

The Court is required to adhere to the Circuit's decision in Davis I and apply the Chevron framework to the Corporation's asset allocation determinations for two reasons.  First, the two

cases the plaintiffs cite in support of their position do not actually state that the doctrine of stare decisis does not apply to a decision resolving a motion for a preliminary injunction. In Petroleum Jobbers, the petitioner filed, among other motions, a motion for a stay to enjoin proceedings pending before the Federal Power Commission. See 259 F.2d at 923. The Circuit declined to grant the petitioner's motion, and twice noted that its rulings were "[w]ithout prejudice to a contrary showing at the time the court [were to] hear[] th[e] case on the merits." Id. at 925; see also id. at 926 ("Again, without prejudice to a later contrary showing by [the] respondent"). But nowhere in its opinion did the Circuit state that the principles of stare decisis would not apply to its decision. See generally id. Likewise, in Nat'l Org. for Women, the Circuit in a per curiam opinion affirmed the district court's issuance of a preliminary injunction barring the release of certain documents pursuant to a FOIA request. See 736 F.2d at 728. In a concurring opinion, Judge Robinson stated that he would have preferred to

> remand the appealed phases of these cases to the District Court with instructions to remand in turn to [the agency] the question of release of information exempt under FOIA but unaffected by the Trade Secrets Act. [He] would further instruct the court to afford [the agency] an opportunity to revise its fact-finding procedures in such manner as it may desire. [He] would affirm the District Court's rulings in all other respects, and let the preliminary injunction remain in force subject to the court's further order. This disposition of these appeals, of course, would leave the parties at liberty to litigate the merits fully, free of any preclusion or limitation by the determinations leading to that injunction.

Id. at 744 (emphasis added) (Robinson, J., concurring). In a footnote, Judge Robinson noted that "[t]he decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits." Id. at 744 n.154 (emphasis added) (quoting Berrigan v. Sigler, 499 F.2d 514, 518 (1974)). Therefore, Petroleum Jobbers and Nat'l Org. for Women stand for the proposition that the Circuit's rulings regarding motions for a

preliminary injunction or to stay proceedings in a case do not constitute the law of the case, nor do they preclude the parties from litigating the merits of the issue in future proceedings in that case.  See Nat'l Org. for Women, 736 F.2d at 744 & n.4; Petroleum Jobbers, 259 F.2d at 925. They do not, however, stand for the position that the Circuit's rulings on such motions have no precedential value or stare decisis impact.  See Nat'l Org. for Women, 736 F.2d at 744 & n.4; Petroleum Jobbers, 259 F.2d at 925.

Indeed, the Circuit has clearly distinguished between the doctrines of law of the case or preclusion and stare decisis.  In Mahoney v. Babbitt, 113 F.3d 219 (D.C. Cir. 1997), the Circuit declined to vacate its prior order issuing an injunction pending the resolution of an appeal on the grounds of mootness, see id. at 220.  The Circuit stated:

> While it is generally accepted that a mooted judgment should not preclude the litigants in future litigation, preclusion is not the same thing as stare decisis, and it is not self-evident that the precedential effects of a mooted judgment should be any less persuasive than if the mooting events had not occurred.  Preclusion is normally based on a decision as to the controversy between the litigating parties. Precedent ordinarily is not. Precedent, more often than not, is drawn from cases not involving either of the parties for or against whom the precedent is offered.
>
> As one commentator has pointed out, there is no particular reason to assume that a decision, later mooted, is any less valid as precedent than any other opinion of a court.  "So long as the court believed that it was deciding a live controversy, its opinion was forged and tested in the same crucible as all opinions."

Id. at 222 (emphasis added) (quoting 13A Wright & Miller, Federal Practice & Procedure § 3533.10 (2d ed. 1984)).  Applying these principles to the case at bar, although the Circuit's ruling in Davis I regarding Chevron deference did not preclude the parties in that case from further litigating that issue in subsequent proceedings, nor did it preclude a subsequent panel from declining to decide that issue upon review of the district court's decision on the merits, the Davis I ruling regarding Chevron deference still has precedential value.

Second, even if the <u>Davis I</u> opinion were not binding on this Court, which obviously it is, the Court would still reach the same conclusion regarding the standard of review applicable here as the Circuit did in that case. The Circuit decided in <u>Davis I</u> that <u>Chevron</u> deference is applicable to the Corporation's asset allocation determinations undertaken as trustee because "the PBGC has unique experience and 'practical agency expertise' in interpreting [the] ERISA. The PBGC is therefore 'better equipped' to interpret [the] ERISA than courts, and it is for this reason [this Court will also] defer to the PBGC's authoritative and reasonable interpretations of ambiguous provisions of [the] ERISA." 571 F.3d at 1293 (quoting <u>LTV Corp.</u>, 496 U.S. at 651).[9]

The plaintiffs also argue that the fact that the Corporation's asset allocation determinations were made in its capacity as trustee

> is especially relevant here, as [the p]laintiffs have plausibly alleged that, rather than in the detached environment of a regulator, the Corporation, in its capacity as trustee, engaged in various conduct that resulted in the Corporation earn[ing] massive investment returns off of assets that should have been timely allocated to the plaintiffs.

---

[9] The Court notes that even though a trustee that is not the Corporation would not receive <u>Chevron</u> deference, that does not necessarily mean that such a trustee's conclusions would be reviewed <u>de novo</u>. As the Circuit has explained,

> [i]n <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." In this latter category of cases, the standard of review—variously described by the Court as "arbitrary and capricious" and "abuse of discretion" review—is plainly deferential."

<u>Wagener v. SBC Pension Benefit Plan—Non Bargained Prgm.</u>, 407 F.3d 395, 402 (D.C. Cir. 2005). In other words, the level of deference a plan trustee is afforded depends on the terms of the plan, <u>see id.</u>, and is not, as the plaintiffs argue, necessarily always <u>de novo</u>, <u>see</u> Pls.' Mem. at 12; <u>see also</u> Pls.' Reply at 17 n.6. The plaintiffs do not raise any argument regarding the level of discretion that the Plan affords a trustee in its briefing before this Court, <u>see generally</u> Pls.' Mem.; Pls.' Reply, nor did they do so in their appeal below, <u>see generally</u> AR 560–617, and therefore, the Court need not consider this issue, <u>see</u> <u>Nuclear Energy Inst., Inc. v. EPA</u>, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.").

Pls.' Mem. at 13–14 (second alteration in original) (internal quotation marks and citation omitted); see also Pls.' Reply at 14 (same). Although it may be true that any assets that the Corporation retained instead of allocating to the plaintiffs could yield a return to the Corporation, that is true in every case in which the Corporation is appointed as trustee. See Piech v. PBGC, 744 F.2d 156, 161 (D.C. Cir. 1984) ("The dual role of trustee and guarantor, a role that Congress has specifically authorized for the PBGC, undoubtedly has some built-in potential for a conflict of interest."). And because the plaintiffs do not provide any specific evidence of self-interested bias or misconduct that influenced the benefits determinations about which they disagree, see Pls.' Mem. at 13–14,[10] the Court finds that the plaintiffs have not plausibly alleged any misconduct by the Corporation that would warrant the Court's departure from its conclusion that the Chevron framework applies in this case.

### iii.   Whether the Appeals Board's Decision Is Too Informal for the Chevron Framework to Apply

Third, the plaintiffs argue that "the informal nature of the Appeals Board's decision places it outside of Chevron's scope." Id. at 14. According to the plaintiffs, "the absence of formal procedures 'weighs against the application of Chevron deference,'" Pls.' Reply at 9 (quoting Fogo de Chao, 769 F.3d at 1137), and therefore, the Court should examine the factors that the Supreme Court set forth in Barnhart v. Walton, 535 U.S. 212 (2002), in assessing whether the Chevron framework applies, specifically: "the interstitial nature of the legal question, the related expertise of the [a]gency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the [a]gency has given the question over a long period of time," Barnhart, 535 U.S. at 222.

---

[10] The plaintiffs' challenges regarding the Administrative Record are discussed infra.

In Fogo de Chao, the Circuit declined for the following reasons to apply the Chevron framework to a decision by the Department of Homeland Security's Administrative Appeals Office denying a L-1B visa to one of the restaurant's churrasqueiro chefs. See 769 F.3d at 1130, 1135–37. First, the Circuit concluded that the agency's regulation "largely parrot[ed], rather than interpret[ed], the key statutory language," and thus merited no deference. Id. at 1136. Second, the Department "openly conceded at oral argument" that the Appeals Office's ruling was "non-precedential," and that, as a result, its "interpretation of the statutory language" did not merit Chevron deference. See id. Therefore, the Circuit concluded that "the expressly non-precedential nature of the Appeals Office's decision conclusively confirm[ed] that the Department was not exercising through the Appeals Office any authority it had to make rules carrying the force of law." Id. at 1137. Third, the decision "w[as] the product of informal adjudication within the [United States Citizenship and Immigration] Service[s], rather than a formal adjudication or notice-and-comment rulemaking," id. at 1136, nor was it "marked by the qualities that might justify Chevron deference in the absence of a formal adjudication or notice-and-comment rulemaking," id. at 1137.

The Court finds that Fogo de Chao does not compel the conclusion that the Chevron framework does not apply here because the three bases for the Circuit's conclusion in Fogo de Chao simply do not apply to the circumstances in this case. First, the plaintiffs do not argue that any Corporation regulation merely parroted the ERISA statute, see generally Pls.' Mem.; Pls.' Reply, and therefore, the first basis for the ruling in Fogo de Chao is inapposite, see 769 F.3d at 1136. Second, unlike the Department in Fogo de Chao, see id., the Corporation has not conceded here that its decision is not precedential, see generally Def.'s Mem.; Def.'s Reply, and therefore, would merit no Chevron deference on that basis. Third, unlike the Department's

decision in <u>Fogo de Chao</u>, the Court concludes that the Appeals Board's decision here, although also an informal adjudication, <u>was</u> "marked by the qualities that might justify <u>Chevron</u> deference in the absence of a formal adjudication or notice-and-comment rulemaking." <u>See</u> 769 F.3d at 1137 (citing <u>Barnhart</u>, 535 U.S. at 222).

Moreover, applying the <u>Barnhart</u> factors, the Court is convinced that the Corporation's decision here merits <u>Chevron</u> deference. Again, in <u>Barnhart</u>, the Supreme Court set forth five factors for courts to consider in determining whether an agency's action merits <u>Chevron</u> deference: "the interstitial nature of the legal question, the related expertise of the [a]gency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the [a]gency has given the question over a long period of time." 535 U.S. at 222. "There is no denying the complexity of the statutory regime under which the [Corporation] operates, the [Corporation's] expertise[,] or the careful craft of the scheme it devised to reconcile various statutory provisions." <u>Mylan Labs., Inc. v. Thompson</u>, 389 F.3d 1272, 1280 (D.C. Cir. 2004); <u>see also</u> <u>Tilley</u>, 490 U.S. at 726 ("For a court to attempt to answer these questions without the views of the agenc[y] responsible for enforcing [the] ERISA, would be to 'embar[k] upon a voyage without a compass.'" (second alteration in original) (quoting <u>Ford Motor Credit Co. v. Milhollin</u>, 444 U.S. 555, 568 (1980))). And the administrative record in this case makes clear that the Corporation and its Appeals Board carefully considered several complex questions regarding the administration of a complex, 178-page Plan, <u>see</u> AR 114–292, in accordance with both the statute and the Corporation's own regulations. The Appeals Board's decision is a seventy-nine-page, single-spaced document, <u>see</u> AR 1–79, which resolved thirteen discrete and complex issues raised in an appeal that involved a record "consist[ing] of more than 2,000 total pages," AR 3. In short, the thorough nature of the Appeals Board's decision clearly

supports the position that the <u>Chevron</u> framework applies, and indeed, courts have afforded the

Corporation <u>Chevron</u> deference for statutory interpretations far less exhaustive.  <u>See, e.g.</u>,

<u>Quality Auto. Servs., LLC v. PBGC</u>, 960 F. Supp. 2d 211, 217, 221 (D.D.C. 2013) (concluding

that the Corporation's statutory interpretation of the ERISA in its "two-page determination"

"represent[ed] a reasonable reading of the statute").

Lastly, the two cases that the plaintiffs cite as support for their proposition that the

<u>Chevron</u> framework does not apply, <u>see</u> Pls.' Mem. at 14 (first citing <u>Sun Capital Partners III v.</u>

<u>New England Teamsters & Trucking Indus. Pension Fund</u>, 724 F.3d 129, 140 (1st Cir. 2013);

then citing <u>GCIU–Emp'r Ret. Fund v. Quad/Graphics, Inc.</u>, 250 F. Supp. 3d 551, 566 (C.D. Cal.

2017)), are not only not binding on this Court, but in any event are also distinguishable.

In <u>Sun Capital</u>, the First Circuit considered "important issues of first impression as to

withdrawal liability for the pro rata share of unfunded vested benefits to a multiemployer pension

fund of a bankrupt company."  724 F.3d at 132.  The plaintiffs, "two private equity funds, [ ]

sought a declaratory judgment against" the defendant, "a struggling portfolio company," "which

brought into the suit other entities related to the equity funds."  <u>Id.</u>  The Corporation was not a

party to the litigation, but filed an amicus brief in support of the defendant.  <u>See id.</u> at 133.  The

Corporation "ha[d] not adopted regulations defining or explaining the meaning" of the statutory

terms at issue, and "[t]he only guidance [the First Circuit] ha[d] from the PBGC [wa]s a 2007

appeals letter, defended in its amicus brief."  <u>Id.</u> at 139.  In its amicus brief, the Corporation did

"not assert that its 2007 letter [wa]s entitled to deference under <u>Chevron</u>," rather, it "claim[ed]

entitlement to deference under <u>Auer v. Robbins</u>, 519 U.S. 452 (1997)."  <u>Id.</u> at 140.  The First

Circuit disagreed that <u>Auer</u> deference was warranted because, under <u>Christopher v. SmithKline</u>

<u>Beecham Corp.</u>, "such deference is inappropriate where significant monetary liability would be

imposed on a party for conduct that took place at a time when that party lacked fair notice of the interpretation at issue." Id. (citing 567 U.S. 142, 156 (2012)). Further, the First Circuit determined that "even if Christopher was not an impediment to Auer deference, the anti-parroting principle would be . . . [, and t]he PBGC['s] regulations ma[d]e no effort to define" the statutory terms at issue. Id. at 141. Therefore, because the First Circuit's decision concerned whether or not to apply Auer deference, not Chevron deference, and the First Circuit determined that Auer deference was inappropriate for two circumstances not present here, the Court concludes that Sun Capital is distinguishable.

In GCIU, the United States District Court for the Central District of California reviewed an appeal of an arbitration decision regarding "withdrawal liability under . . . [the] ERISA . . . and the Multiemployer Pension Plan Amendments Act of 1980." 250 F. Supp. 3d at 554. The defendant, an employer that "ceased contributing to a multiemployer pension plan," id., "argue[d] that the [c]ourt should defer to an opinion letter written by the . . . Corporation [ ] that concluded that the [twenty]-year payment cap should be applied before the partial withdrawal credit," id. at 564. The court concluded that the opinion letter did not merit Chevron deference because "agency opinion letters do not warrant [such] deference," id. at 565 (citing Christensen v. Harris Cty., 529 U.S. 576, 587 (2000)), and because "there is no ambiguity under the [statute] as to whether the [twenty]-year payment cap should be applied before the partial withdrawal credit," id. at 566; see also id. ("The PBGC's contrary conclusion cannot supersede unambiguous statutory language."). The district court also "conclude[d] that the opinion letter carrie[d] little or no added persuasive force under Skidmore" because it "d[id] not address the myriad arguments that cut strongly against its interpretation, and the PBGC d[id] not appear to rely on any specialized knowledge or expertise in reaching its conclusion." Id.

The Court concludes that GCIU is distinguishable for two reasons. First, in that case, the Corporation was not a party to the suit, nor was either party seeking judicial review of a Corporation decision. See id. at 554. Second, the Corporation opinion letter in that case was a two-page letter, written by the Acting Director of the Corporation's Legal Department more than thirty years before the GCIU decision was issued, responding to a "request for the PBGC's opinion concerning [a provision] of [the] ERISA." See Arbitration Record at 626–27, GCIU–Emp'r Ret. Fund v. Quad/Graphics, Inc., No. 16-3391 (C.D. Cal. Aug. 17, 2016), ECF No. 21-9. Therefore, the Corporation's "uncited, conclusory assertions of law in a short, informal document that does not purport to set policy for future [Corporation] determinations," see Fox v. Clinton, 684 F.3d 67, 78 (D.C. Cir. 2012), is unlike the Appeals Board's decision in this case, which "was offered in an 'exhaustive [adjudicative] decision,' in which the agency . . . 'was acting pursuant to an express delegation from Congress' . . . [and] addressing 'precisely the sort of complex, interstitial questions that the [agency] deserves deference to address,'" id. at 77–78 (first and final alterations in original) (quoting Menkes v. DHS, 637 F.3d 319, 326, 331–32 (D.C. Cir. 2011)). Accordingly, the Court concludes that the Appeals Board's decision is not too informal for the Chevron framework to apply.[11]

---

[11] The Court located a third case in which a court concluded that the Chevron framework did not apply to the Corporation's actions, see In re UAL Corp. (Pilots' Pension Plan Termination), 468 F.3d 444 (7th Cir. 2006), but concludes that it too is distinguishable from the circumstances here. In In re UAL Corp., the Corporation filed an adversary complaint in the United Airlines bankruptcy proceedings, see id. at 447–48, pursuant to its authority under 29 U.S.C. § 1342, which "requires the PBGC to initiate litigation," id. at 450. The Seventh Circuit determined that the Corporation did not merit Chevron deference for its actions under § 1342, which "requires the PBGC to initiate litigation," because that section "gives the resolution of" whether "the Letter Agreement between United and the ALPA exposed the [PBGC's] insurance fund to an 'unjustified increase' in liability" "to the judiciary; [thus,] the PBGC participates as a litigant, not as the decision-maker." Id. at 450–51. Here, the Corporation is not seeking Chevron deference for any action it took as a litigant under § 1342, but rather for its benefit determinations, as affirmed by the Appeals Board's comprehensive decision. See Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan, 512 F. Supp. 2d 32, 38 (D.D.C. 2007) ("The provision at issue in United Airlines, however, actually interprets a different provision of [the] ERISA, 29 U.S.C. § 1342, which pertains to lawsuits initiated by [the] PBGC, where [it] acts as an ordinary litigant, as opposed to actions, such as this one, that challenge the agency's determinations pursuant to § 1303.").

### iv.        Whether the Administrative Record Is Facially Flawed

Fourth, the plaintiffs argue that "the Appeals Board's decision is inconsistent with the qualities of an agency determination deserving of <u>Chevron</u> deference because it relies upon a facially flawed administrative record."  Pls.' Mem. at 14.  According to the plaintiffs, "by relying upon an outdated and discredited evaluation of the Plan's assets, the Corporation's action is not only due no deference, but is, on its face, arbitrary and capricious."  <u>Id.</u> at 15.  In response, the Corporation rejects the factual predicate of the plaintiffs' argument, <u>i.e.</u>, that the administrative record is flawed.  <u>See</u> Def.'s Mem. at 17 ("[The] PBGC did not, as the [plaintiffs] assert, 'acknowledg[e] that its initial valuation efforts were flawed.'" (first alteration in original) (quoting Pls.' Mem. at 8 n.5)).  Although the Corporation acknowledges that it "initiated a re-evaluation of the Plan's assets," it asserts that "this was not because of any known flaw in the initial valuation for this Plan, but rather, in an abundance of caution due to certain flaws identified in <u>other</u> cases in which the initial valuation was performed by the same contractor." <u>Id.</u>  According to the Corporation, it issued its determination while the re-evaluation was pending in order to "avoid[] delaying the [plaintiffs'] benefit determinations, while preserving their right to challenge any later adjustment to their benefits."  <u>Id.</u> at 17–18.  And the Corporation argues that even if its determination "cannot be sustained on the administrative record, the remedy [ ] is not to eliminate the applicable deference," but rather "to remand to the agency for additional investigation or explanation."  <u>Id.</u> at 18 (quoting <u>Cty. of Los Angeles v. Shalala</u>, 192 F.3d 1005, 1023 (D.C. Cir. 1999).

The Court is not persuaded that the Corporation's reliance on the initial evaluation of the Plan's assets would render the Corporation's statutory interpretations of [the] ERISA ineligible for <u>Chevron</u> deference.  To the extent that the plaintiffs argue that the Corporation's reliance on

the initial evaluation was arbitrary and capricious, the Court rejects that argument because the plaintiffs have not suffered any prejudice as a result of that reliance because the re-evaluation has since been completed. See Olson v. Clinton, 602 F. Supp. 2d 93, 103–04 (D.D.C. 2009) ("When a plaintiff alleges that an agency's decision suffers from procedural flaws that render its decision 'arbitrary and capricious,' he must show that procedural errors existed and that prejudice resulted from these errors." (citing Carstens v. Nuclear Regulatory Comm'n, 742 F.2d 1546, 1558 (D.C. Cir. 1984))). The new "value of the [P]lan assets is about one-half of 1% (0.5%) higher than in the initial evaluation," "6,000 of the 13,000 participants" will receive a benefit increase, "[t]he average increase in monthly benefits is less than four dollars, "95% of [which will be] less than ten dollars per month," and "[p]articipants who receive a revised benefit determination will be able to appeal the new determination." Delta Pilot Retirement Plan's Asset Re-evaluation Questions and Answers, Pension Benefit Guaranty Corporation, https://www.pbgc.gov/about/faq/delta-asset-re-eval-qa (last visited Mar. 23, 2018).[12] And the Court agrees with the Corporation that it "may base its defense of the [plaintiffs'] benefit determinations only on the documents that the agency considered," and therefore, "[a]ny attempt to substitute the agency's later asset-re-evaluation would not demonstrate the 'careful consideration' . . . but rather, violate bedrock precepts of administrative law." Def.'s Reply at 10; see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985) ("'[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.' The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing

---

[12] The Court takes judicial notice of the publicly available information on the Corporation's website. See, e.g., Seifert v. Winter, 555 F. Supp. 2d 3, 11 n.5 (D.D.C. 2008) (Walton, J.) (collecting cases that allow the taking of judicial notice of information published on government websites).

court." (alteration in original) (first quoting <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973); then

citing <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402 (1971))).  Accordingly, the

Court concludes that the Corporation's decision to re-audit the Plan's assets, a decision which

the plaintiffs themselves requested in their appeal, <u>see</u> AR 1, and to issue new, appealable benefit

determinations based on the re-audit, does not render the <u>Chevron</u> framework inapplicable to this

matter.[13]

## 2.     The Applicable Standards of Review

For all of the reasons stated above, the Court concludes that the <u>Chevron</u> framework

applies.  With respect to questions of statutory interpretation of the ERISA, the Court will first

consider "whether Congress has directly spoken to the precise question at issue," and, if "the

intent of Congress is clear" from the statute's language, "that is the end of the matter; for the

[C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of

Congress."  <u>Chevron</u>, 467 U.S. at 842–43.  However, if the statute is ambiguous, the Court shall

defer to the Corporation's construction of the statute.  <u>See id.</u>  Deference is due "not only

because Congress has delegated law-making authority to the [Corporation], but also because that

---

[13] In their reply, the plaintiffs assert a fifth reason why the Corporation's benefits determinations should not be afforded <u>Chevron</u> deference: "The fact that Congress clearly did not intend to provide the Corporation with deference when serving in a trustee capacity allocating assets under 29 U.S.C. § 1344(a) is further evidenced by contrasting the language there with that of § 1344(f)."  Pls.' Reply at 15.  According to the plaintiffs, the language in § 1344(f), which states that the Corporation's determinations of the value of certain recovery payments "shall be binding unless shown by clear and convincing evidence to be unreasonable," <u>id.</u> (quoting 29 U.S.C. § 1344(f)(4)), "stands in stark contrast to that of § 1344(a)," where Congress "declined to include the 'clear and convincing' standard later articulated in § 1344(f)," <u>id.</u> at 15–16.  As an initial matter, "[j]udges in this District have repeatedly held that arguments may not be raised for the first time in a party's reply."  <u>Nytes v. Trustify, Inc.</u>, 297 F. Supp. 3d 191, 202 (D.D.C. 2018) (Walton, J.) (collecting cases).  In any event, Congress's decision to not add a "clear and convincing evidence" standard, or any other standard, suggests that Congress intended courts to apply the default "arbitrary and capricious" standard that is typical of judicial review of agency actions.  <u>See, e.g.</u>, <u>United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO–CLC, ex rel. Participants & Beneficiaries of Thunderbird Mining Co. Pension Plan v. PBGC</u>, 707 F.3d 319, 323 (D.C. Cir. 2013) ("[The] ERISA permits plan participants who are 'adversely affected' by an action of the [Corporation] to bring suit against the agency in district court, 29 U.S.C. § 1303(f), but the statute does not specify the standard of judicial review.  In such a case, a court generally must apply the 'arbitrary or capricious' standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)." (citing <u>Alaska Dep't of Envtl. Conservation v. EPA</u>, 540 U.S. 461, 496–97, (2004))).

agency has the expertise to produce a reasoned decision." <u>Vill. of Barrington, Ill. v. Surface</u> <u>Transp. Bd.</u>, 636 F.3d 650, 660 (D.C. Cir. 2011). And the Court must accept the Corporation's interpretation of its own regulations unless plainly erroneous or inconsistent with the regulation itself. <u>See Auer</u>, 519 U.S. at 461; <u>see also Boivin</u>, 446 F.3d at 154 (noting that courts "owe substantial deference" to the Corporation's "interpretation of its own regulations").

In regards to the standard of review for all other actions of the Corporation challenged by the plaintiffs, the Court concludes that Claims Two through Four must be resolved under the arbitrary and capricious standard of review[14] because they are brought pursuant to 29 U.S.C. § 1303(f), <u>see</u> Am. Compl. ¶ 14, and "§ 1303(f) . . . does not specify the [applicable] standard of judicial review. [And i]n such a case, a court generally must apply the 'arbitrary and capricious' standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)," <u>United Steel, Paper &</u> <u>Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO–CLC, ex</u> <u>rel. Participants & Beneficiaries of Thunderbird Mining Co. Pension Plan v. PBGC</u>, 707 F.3d 319, 323 (D.C. Cir. 2013); <u>see also id.</u> at 324 ("In the administrative context, we generally review an agency's application of an undisputed legal standard to a particular set of facts under a deferential standard.").[15]

To determine whether the Corporation's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the Court "is not to

---

[14] The parties do not dispute, <u>see</u> Pls.' Mem. at 35; <u>see also</u> Def.'s Mem. at 39, that Congress has designated the standard of review for Claim Five, which challenges the Corporation's calculations of benefits under § 1322(c): "Determinations under this subsection shall be made by the [C]orporation[, . . . and] shall be binding unless shown by clear and convincing evidence to be unreasonable," 29 U.S.C. § 1322(c)(4).

[15] Other members of this Court have agreed that arbitrary and capricious review applies to challenges to the Corporation's determinations brought pursuant to § 1303(f). <u>See, e.g.</u>, <u>Maher v. PBGC</u>, 271 F. Supp. 3d 296, 300, 302 (D.D.C. 2017), <u>reconsideration denied</u>, No. 16-1646 (KBJ), 2017 WL 7689634 (D.D.C. Dec. 1, 2017), <u>appeal docketed</u>, No. 18-5036 (D.C. Cir. Feb. 12, 2018); <u>Burmeister v. PBGC</u>, 943 F. Supp. 2d 83, 87–88 & n.4 (D.D.C. 2013); <u>David v. PBGC</u>, 864 F. Supp. 2d at 155; <u>Sara Lee Corp.</u>, 512 F. Supp. 2d at 37–38.

substitute its judgment for that of the agency," <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). And, when an agency action depends on a "high level of technical expertise," the Court must "defer to 'the informed discretion of the responsible federal agenc[y].'" <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 377 (1989) (quoting <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976)). But, the Corporation must still articulate a "factual basis" that permits the Court to "conclude that the PBGC has reached its decision on the basis of a reasonable accommodation of the policies underlying [the] ERISA." <u>Rettig</u>, 744 F.2d at 156.

To uphold the Corporation's actions, the Court must be satisfied that the Corporation "examine[d] the relevant [issues] and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" <u>State Farm</u>, 463 U.S. at 43 (quoting <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)). Although the Court must conduct a "searching and careful" review, <u>Citizens to Preserve Overton Park</u>, 401 U.S. at 416, the Corporation's actions are "entitled to a presumption of regularity," <u>id.</u> at 415, and the Court "will not second guess an agency decision or question whether the decision made was the best one," <u>C & W Fish Co. v. Fox</u>, 931 F.2d 1556, 1565 (D.C. Cir. 1991). Rather, the Court must uphold the Corporation's decision "so long as [it] 'engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record.'" <u>Clark Cty. v. FAA</u>, 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting <u>N.Y. Cross Harbor R.R. v. STB</u>, 374 F.3d 1177, 1181 (D.C. Cir. 2004)).

**B.    Claim Two**

In Claim Two, the plaintiffs argue that the Corporation improperly valued the Plan's liabilities and allocated Plan assets by not taking into account the ALPA Payments that the

Active Pilots received from Delta pursuant to Letter of Agreement #51.  See Am. Compl. ¶ 74;
see also Pls.' Mem. at 15 ("[The p]laintiffs allege that the Corporation violated [the] ERISA by
performing § 1344 allocations for unfunded Plan benefits without factoring in that the Active
Pilots had already been compensated for those unfunded nonguaranteed pension benefits through
the Replacement Payments (i.e., the payments deriving from the ALPA Notes and [the] ALPA
Claim).").  According to the plaintiffs, "[t]he Corporation's allocation decision means that the
Active Pilots will be compensated twice for the same 'unfunded' Plan benefits, at the [p]laintiffs'
expense (because the funds that would otherwise go to [the p]laintiffs' benefits go [to] the Active
Pilots, leaving [the p]laintiffs' benefits unfunded)."  Pls.' Mem. at 15.  The plaintiffs set forth
two reasons why the Corporation should have taken the ALPA Payments into account, which the
Court will address in turn.

### 1. The Corporation's Objections to Letter of Agreement #51

First, the plaintiffs point out that the Corporation took the same position in its opposition
to Letter of Agreement #51 in the Bankruptcy Court that the plaintiffs take now; namely, "that
the Active Pilots['] [u]nfunded [n]onguaranteed [b]enefits [w]ere [f]unded by the [ALPA]
Payments."  Id. at 16.  According to the plaintiffs, because the Bankruptcy Court declined to
resolve the factual issue as to whether the ALPA Payments were intended to replace Plan
benefits, the Bankruptcy Court's approval of Letter of Agreement #51 "did not undermine the
Corporation's determination" on this issue.  See id. at 18–19.

The plaintiffs are correct that the Corporation argued before the Bankruptcy Court that
"Delta and [the] ALPA intend[ed] to use the [ALPA Payments] to replace unfunded benefits
under the Pilots Plan by using the proceeds to fund follow-on retirement plans and other
payments or distributions to pilots," AR 1049; see also AR 1053, 1064, 1069, and that the

Bankruptcy Court explicitly declined to make findings of fact regarding the purpose of the ALPA Payments, instead denying the Corporation's objection to Letter of Agreement #51 as a matter of law, see AR 446–54.  However, the Court agrees with the Corporation, see Def.'s Mem. at 23 (stating that the Corporation's initial objection to the ALPA Payments "has no effect on the allocation of the Plan's assets or the reasonableness of [the] PBGC's statutory construction"), that its opposition to the ALPA Payments in Bankruptcy Court is irrelevant to the issue of whether the Corporation is required, under the ERISA and the Corporation's regulations, to consider the ALPA Payments as part of its valuation and allocation decisions.[16]  Instead, to resolve this question, the Court must look at the statute and the regulations themselves.[17]

## 2.    PC5 Benefits

As noted earlier, supra at 5, PC5 benefits are "all other nonforfeitable benefits under the plan," 29 U.S.C. § 1344(a)(5), that are not guaranteed by the Corporation, id. § 1344(a)(4)(A). The plaintiffs argue that the ERISA's definition of a nonguaranteed, nonforfeitable benefit "does not address specifically whether such entitlement can be extinguished when the benefit is funded

---

[16] In fact, the Corporation's position in Bankruptcy Court actually suggests the opposite.  In its opposition to Letter of Agreement #51 filed with the Bankruptcy Court, the Corporation argued that the Active Pilots would receive a double recovery precisely because the Corporation would not be able to take the ALPA Payments into account in its benefit determinations.  See AR 1064 ("Participants would recover [u]nfunded [n]onguaranteed [b]enefits from both the employer and [the] PBGC, and the bankruptcy estate would be paying the same claim twice—once to participants and once to [the] PBGC.").

[17] The plaintiffs also argue that the Appeals Board "concede[d] that [the] ERISA does not prohibit [it] from taking the [ALPA] Payments into account," Pls.' Mem. at 20, when it stated in its decision that the "ERISA does not require [the] PBGC to account for the ALPA Payments for purposes of allocating the Pilots Plan's assets and [the] PBGC's recoveries," AR 41.  According to the plaintiffs, the Appeals Board did not state "that [the] ERISA prohibits such an accounting," and thus, "the legal issue turns on whether the Corporation's construction of the statute is consistent with [the] ERISA's purposes."  Pls.' Mem. at 20; see also id. at 20–21 (describing the ERISA's purposes as favoring retirees).  The Corporation disputes that it conceded anything, claiming that the plaintiffs' characterization of the Appeals Board's statement that the Corporation "is not required to take the ALPA Payments into account" as a concession that the ERISA permits such an accounting is "hair-splitting."  Def.'s Mem. at 24. The Court agrees with the Corporation that it did not concede, at the administrative level, that the ERISA permits the Corporation to take the ALPA Payments into account in its determination of benefits.  In any event, even if that point had been conceded below, the Court must still consider the legal issue on the merits.  See Cohen v. Bd. of Trs. of Univ. of the Dist. of Columbia, 819 F.3d 476, 483 (D.C. Cir. 2016) (noting the "weighty preference in favor of deciding cases on their merits").

from a source outside the plan," Pls.' Mem. at 20, and therefore, given the ERISA's purpose to protect employees' retirement income security, the Corporation should have interpreted the statute liberally to allow it to factor in the ALPA Payments paid to the Active Pilots, see id. at 20–21; see also Pls.' Reply at 22–23 (same). The Corporation argues in response that it would have been "inconsistent with the statute" for it to factor in the ALPA Payments, which were "monies [ ] not held by the Plan, not used by the Plan to pay Plan benefits, and not recovered by [the] PBGC." Def.'s Mem. at 21; see also Def.'s Reply at 13–14 (same). The Court agrees with the Corporation.

> The ERISA defines "nonforfeitable benefit," "with respect to a plan," as
>
> a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or Title 26.

29 U.S.C. § 1301(a)(8).

In the Court's view, the statute is unambiguous under Chevron step one, considering that it defines a nonforfeitable benefit as a benefit "under a pension plan or under 'requirements of this chapter,' that is, Chapter 18 of Title 29 [of the United States Code]. Chapter 18, in turn, encompasses the ERISA." Deppenbrook v. PBGC, 950 F. Supp. 2d 68, 77 (D.D.C. 2013) (Walton, J.) (quoting 29 U.S.C. § 1301(a)(8)), aff'd, 788 F.3d 166 (D.C. Cir. 2015). In other words, the statute explicitly limits nonforfeitable benefits to those to which a participant is entitled under a plan, "as opposed to under other statutes or documents." Id. Because the ALPA Payments were never incorporated into the Plan, but rather were part of a distinct agreement made between Delta and the ALPA, see AR 932–72 (Letter of Agreement #51), the Court agrees

with the Corporation that it was not permitted, under the statute, to factor the ALPA Payments into its § 1344 allocations, the purpose of the ERISA notwithstanding. See Belland, 726 F.2d at 844 (noting that "the principle that remedial statutes are to be liberally construed to effectuate their purpose . . . 'does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress'" (quoting Symons v. Chrysler Corp. Loan Guarantee Bd., 670 F.2d 238, 241 (D.C. Cir. 1981))).

Nor is the Court persuaded by the plaintiffs' argument that the Corporation "take[s] account of such non-plan funding in other contexts," as evidenced by its regulation concerning obligations pursuant to an insurance contract. See Pls.' Mem. at 20; see also Pls.' Reply at 23 (same). That regulation provides that "an irrevocable commitment by an insurer to pay a benefit, which commitment is in effect on the date of the asset allocation, is not considered a plan asset, and a benefit payable under such a commitment is excluded from the allocation process." 29 C.F.R. § 4044.3(a). According to the plaintiffs, the fact that the Corporation takes into account obligations pursuant to an insurance contract demonstrates that "plainly the statute does not forbid the[] consideration" of payments from outside the plan, Pls.' Reply at 23, and the Corporation's decision to not factor in the ALPA Payments when it would factor in obligations pursuant to an insurance contract "establishe[s] that [the] agency['s] action is arbitrary [because] the agency offers insufficient reasons for treating similar situations differently," id. (quoting Shalala, 192 F.3d at 1022).

The Court agrees with the Corporation that the circumstances addressed in 29 C.F.R. § 4044.3(a) are distinguishable from the ALPA Payments because in the case of insurance payments, "the pension benefit becomes an obligation of the insurance company when it issues a contract; it is no longer an obligation of the plan," while in the case of the ALPA payments, "the

47

Plan's obligations to pay benefits were never reduced by the ALPA payments." Def.'s Mem. at 25; see also Def.'s Reply at 15 (arguing that the plaintiffs' "analogy to irrevocable insurance contracts, i.e., annuities bought by a plan that transfer payment responsibility to an insurer, is inapposite . . . [because t]he purchase of such a contract satisfies the participant's benefits under the plant. It does not provide additional benefits" (citing Beck, 551 U.S. at 1096)). Rather, the ALPA Claim is a "general non-priority unsecured claim under section 502 of the Bankruptcy Code . . . in the amount of $2.1 billion," which the ALPA Delta Master Executive Council allocated among the pilots, see AR at 966–67, while the ALPA Notes were issued by Delta to the ALPA "[i]n the event that the . . . Plan [ ] terminated," AR 968, with the ALPA determining "[d]istribution mechanics, eligibility, and allocation among [ ] pilots," AR 971. Therefore, because the ALPA payments were never Plan assets, nor did they extinguish any Plan obligations, the Corporation properly declined to take these payments into account in its § 1344 allocation.

## C.    Claim Three

In Claim Three, the plaintiffs challenge the Corporation's determination that the Plan provision incorporating the increased compensation limit was not "in effect" five years prior to the Plan's termination on September 2, 2006, and therefore, did not apply to the Corporation's calculations of the plaintiffs' PC3 benefits. See Am. Compl. ¶¶ 89–91. As explained earlier, supra at 4–5, under the ERISA, benefits only qualify for PC3 status if "the provisions of the plan creating them were 'in effect' within the five-year period prior to plan termination." Davis II, 734 F.3d at 1165 (quoting 29 U.S.C. § 1344(a)(3)(A)). The Corporation has promulgated a regulation interpreting the requirement that a benefit be "in effect" in order to qualify for PC3 status to mean that the benefit must be "the lowest annuity benefit payable under the plan

provisions at any time during the [five]–year period ending on the termination date." 29 C.F.R. § 4044.13(b)(3)(i).

In <u>Davis II</u>, the U.S. Airways pilots challenged the Corporation's determination that a certain benefit increase was not included in PC3. <u>See</u> 734 F.3d at 1167. The plan provision there creating that benefit increase "was adopted on December 4, 1997, had an 'effective date' of January 1, 1998, and allowed [certain U.S. Airways] pilots . . . to elect to receive the benefit between March 1, 1998 and April 30, 1998. Those who elected to receive the benefit could not receive it before May 1, 1998." <u>Id.</u> The U.S. Airways pilots' plan terminated on March 31, 2003, <u>see id.</u> at 1166, and therefore, to be included in PC3, the benefit had to be "in effect" before March 31, 1998, five years prior to the plan's termination, <u>see</u> 29 U.S.C. § 1344(a)(3). The pilots argued that the benefit was "in effect" as of the "effective date" of January 1, 1998, and because that date was more than five years prior to the plan's termination, the benefit should have been included in PC3. <u>See</u> 734 F.3d at 1168. But, the Circuit deferred to the Corporation's interpretation of the statutory language of "in effect" to mean "payable," <u>id.</u> (citing 29 C.F.R. § 4044.13(b)(3)(i)), and concluded that "because the earliest date the benefit could be paid was [May 1, 1998,] one month after the beginning of the five-year period preceding the date of [p]lan termination, the [ ] benefit could not be included in [PC3]," <u>id.</u> at 1167. With the Circuit's holding as its guidepost, the Court reiterates the following relevant dates in this case.

On June 7, 2001, Congress passed the EGTRRA, which increased the compensation limit to $200,000 for plan years beginning after December 31, 2001. <u>See</u> Pub. L. No. 107-16, § 611(c)(1), (i)(l), 115 Stat. at 97, 100. Therefore, the first Plan year to which the increased compensation limit could apply is the Plan year that began on July 1, 2002. <u>See</u> AR 129 (defining the Plan's "plan year" as "[t]he [c]ompany's fiscal year ending each June 30").

The PWA provides that any statutory increase to the compensation limit "will be effective for the . . . [Plan] as of the earliest date that the increased [q]ualified [p]lan [l]imits could have become legally effective for that Plan, had that Plan not been collectively bargained," AR 3697, and also states that the provision incorporating the increased compensation limit would be effective as of September 1, 2001, AR 3695. The IRS notice setting effective dates for the increased compensation limit provides that

> [i]n the case of a plan that uses annual compensation for periods prior to the first plan year beginning on or after January 1, 2002, to determine accruals or allocations for a plan year beginning on or after January 1, 2002, the plan is permitted to provide that the $200,000 compensation limit applies to annual compensation for such prior periods in determining such accruals or allocations.

I.R.S. Notice 2001-56, 2001-2 C.B. 277. The Fourth Amendment, whose purpose is "to reflect certain provisions of . . . [the] EGTRRA," and "is intended as good faith compliance with the requirements of [the] EGTRRA and is to be construed in accordance with [the] EGTRRA and guidance issued thereunder," AR 244, states that its provisions, including the increased compensation limit, see AR 245, are "[e]ffective July 1, 2002, or such other effective date as may be provided in a provision below," AR 244. The Fourth Amendment also provides that

> [t]he Earnings taken into account in determining benefit accruals of an Employee in any Plan Year beginning after June 30, 2002 shall not exceed $200,000 . . . . In determining benefit accruals of [retired] Employees . . . in Plan Years beginning after June 30, 2002, the annual compensation limit provided in this paragraph for Plan Years beginning before July 1, 2002 shall be $200,000, or, if greater, the annual compensation limit in effect under Section 401(a)(17) of the Code for that Plan Year . . . .

AR 245 (emphasis added).

The plaintiffs make much of the IRS notice, the PWA, and the Fourth Amendment, arguing that under the PWA, "the Plan was obligated to make increases to the [c]ompensation [l]imit 'effective' 'as of the earliest date that the increased [q]ualified [p]lan [l]imits could have

been legally effective for that plan," and because the IRS notice allowed the Plan to apply the increased compensation limit to plan years prior to July 1, 2002, the increased compensation limit was payable, and thus in effect, for five years prior to the plan's termination. See Pls.' Mem. at 31; see also Pls.' Reply at 30 (arguing that under the PWA, "the Plan was obligated to make increases to the [c]ompensation [l]imit 'effective' 'as of the earliest date that . . . [they] could have become legally effective for that Plan").

Upon review of the EGTRRA, the PWA, the IRS notice, and the Fourth Amendment, the Court is not persuaded that the Corporation's determination that the increased compensation limit was not in effect five years prior to the Plan's termination on September 2, 2006, because it was not payable until July 1, 2002, was arbitrary or capricious. The Court agrees with the Corporation that although the IRS notice allowed the Plan to apply the increased compensation limit to annual compensation for plan years prior to the July 1, 2002 plan year, it could do so only for the purpose of "determin[ing] accruals or allocations for [the July 1, 2002 plan year]," see I.R.S. Notice 2001-56, 2001-2 C.B. 277 (emphasis added), and the Fourth Amendment applied the increased compensation limit to plan years prior to July 1, 2002 "only for determining benefits payable to [p]ilots who retired after July 1, 2002," Def.'s Mem. at 31. The Fourth Amendment states that (1) "[t]he Earnings taken into account in determining benefit accruals of an Employee in any Plan Year beginning after June 30, 2002, shall not exceed $200,000," and (2) "[i]n determining benefit accruals of [retired] Employees . . . in Plan Years beginning after June 30, 2002, the annual compensation limit . . . for Plan Years beginning before July 1, 2002 shall be $200,000." AR 245 (emphases added). If the Court interpreted the Fourth Amendment language regarding retired employees to allow the increased compensation limit to apply to Plan years prior to July 1, 2002, as the plaintiffs argue, that interpretation would

not only negate the first clause, which provides that the increased compensation limit applies only for Plan years beginning on and after July 1, 2002, see id., but it would also contradict the EGTRRA itself, which provides that the increased compensation limit applies to plan years beginning after December 31, 2001, see Pub. L. No. 107-16, § 611(c)(1), (i)(l), 115 Stat. at 97, 100. Certainly, neither the IRS notice nor the terms of the Plan (either the PWA or the Fourth Amendment) can be construed in contravention of the statute itself. See AR 244 (stating that the Fourth Amendment "is intended as good faith compliance with the requirements of [the] EGTRRA and is to be construed in accordance with [the] EGTRRA and guidance issued thereunder"); see also Davis II, 734 F.3d at 1168 (rejecting the argument that the benefit was "in effect" as of the plan's stated effective date). Accordingly, the Court concludes that the Corporation's determination that the increased compensation limit went into effect, i.e., became payable, on July 1, 2002, less than five years prior to the Plan's termination, and thus could not be included in the Corporation's calculations of the plaintiffs' PC3 benefits, was reasonable, and not arbitrary and capricious.[18]

## D. Claim Four

In Claim Four, the plaintiffs challenge the Corporation's determination that the Plan provision incorporating Congress's increase to the qualified benefit limit was in effect more than five years prior to the Plan's termination, and thus includable in the Corporation's calculations of PC3 benefits, only for pilots who were active at the time the PWA was signed, and not for pilots who retired before July 1, 2001. See Am. Compl. ¶¶ 114–20. The parties agree that the PWA

---

[18] The plaintiffs claim that the Corporation conceded in an internal memo that it "could apply [the] increased [c]ompensation [l]imit to plan years prior to January 1, 2002," Pls.' Mem. at 28, when it concluded that, "[i]n determining such post-2001 accruals in the case of a plan that uses a final average earnings formula, the plan may apply a $200,000 limit to earnings from years prior to 2002," id. (quoting AR 1235). Again, the language in this memorandum is limited to determinations of "post-2001 accruals," see id. (emphasis added), and therefore, the Corporation did not "concede" the plaintiffs' position.

incorporating the increased qualified benefit limit was in effect five years prior to the Plan's termination, but disagree as to whether that provision covers all pilots or only pilots active when the PWA was signed in 2001. See Pls.' Mem. at 32–33; Def.'s Mem. at 33. The plaintiffs argue that the Corporation's determination that the PWA provision applied only to active, and not retired, pilots was erroneous because the PWA "does not state that the '[q]ualified [p]lan [l]imits' will be different for Plan participants depending upon their retirement status." Pls.' Mem. at 32; see also Pls.' Reply at 32 (same).

The Corporation responds that the Fourth Amendment provides that the qualified benefit limit was increased for Active Pilots as of July 1, 2001, while the increase did not go into effect for retired pilots until July 1, 2002. See Def.'s Mem. at 34; see also id. at 36. According to the Corporation, if the PWA provision were read to cover pilots who were retired when the PWA was adopted, such a reading "would conflict with the Fourth Amendment, which does not make the [qualified] benefit[]limit increase effective until July 1, 2002, for this group." Id. at 36. Furthermore, the Corporation argues that the PWA provision only covered Active Pilots because (1) "the PWA was an agreement between Delta and its actively employed pilots," id. at 35, and (2) "there is no presumption that a collective bargaining agent represents retirees in negotiations or that a collective bargaining agreement covers them with respect to retirement benefits," id. at 36; see also Def.'s Reply at 20–21. The Corporation notes that the plaintiffs' argument "that [the] ALPA represented the retirees' interests is especially odd here, given the[ir] contention in Claim Two that [the] ALPA represented the interests of [A]ctive [P]ilots to the disadvantage of the [plaintiffs] when negotiating [Letter of Agreement] #51." Def.'s Mem. at 36.

Upon review of both the PWA and the Fourth Amendment, the Court concludes that the Corporation's interpretation is reasonable, and therefore not arbitrary and capricious. The PWA

provision incorporating the increased qualified benefit limit does not explicitly state whether it applies only to Active Pilots.  See AR 3697 (stating that if the qualified benefit limit is increased, that increase is effective as of the earliest date it could have become legally effective in the absence of a collective bargaining agreement).  The Fourth Amendment, on the other hand, explicitly distinguishes between employees' "annuity starting dates," i.e., their dates of retirement.  See AR 248.  Specifically, the Fourth Amendment states that the increased qualified benefit limit "shall be effective beginning with the [plan] year starting on July 1, 2001[,] for those Employees whose Annuity Starting Date is on or after July 1, 2001," but "[w]ith respect to Participants whose Annuity Starting Date was before July 1, 2001, the increased [qualified benefit] limit . . . shall be effective for annuity payments made on or after July 1, 2002."  AR 248.  Because the Corporation reviewed both provisions, and declined to interpret the PWA provision as covering pilots who retired before July 1, 2001, as doing so would directly conflict with the Fourth Amendment, the Court is satisfied that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168).  The Court declines to entertain the plaintiffs' argument that if the PWA provision and the Fourth Amendment conflict, the more employee-favorable document should govern, see Pls.' Reply at 33, because doing so would require the Court to "question whether the decision made was the best one," which the Court is not permitted to do, see C & W Fish Co., 931 F.2d at 1565.  Accordingly, the Court concludes that the Corporation's determination that the increased qualified benefit limit was in effect more than five years prior to the Plan's termination, and thus includable in PC3, only for pilots who were active at the time the PWA

was signed, and not for pilots who retired before July 1, 2001, was reasonable, and not arbitrary and capricious.[19]

## E.      Claim Five

In Claim Five, the plaintiffs contend that the Corporation erred "in allocating the funds it recovered from Delta after the Plan's termination . . . [, which] unfairly reduced [the p]laintiffs' share of these funds."  Am. Compl. ¶ 130.  Specifically, the plaintiffs claim that the Corporation "added an unlawful step to the formula set by Congress—by reducing the amount of the recovery to the date of Plan termination—that eliminated $55.5 million dollars from the funds the PBGC should have put toward pension benefits."  Id. ¶ 138; see also Pls.' Mem. at 34 ("[T]he Corporation inappropriately reduced the amount of funding available for PC5 by improperly discounting the value of the recoveries available to fund PC5 liabilities by roughly $55 million.").  They also claim that "the PBGC erroneously excluded the 2001-06 increases to the [c]ompensation [l]imit and the [q]ualified [b]enefit [l]imit in allocating the recovered funds that were to be distributed to the Plan's participants and beneficiaries under [PC5(a)]."  Am. Compl. ¶ 142; see also Pls.' Mem. at 34 ("[T]he Corporation illegally judged [the p]laintiffs' unfunded

---

[19] The plaintiffs also argue that the Corporation's determination that the PWA provision incorporating the increased qualified benefit limit only applied to Active Pilots is erroneous because other PWA provisions "explicitly note[]" that they do apply to retirees.  See Pls.' Mem. at 33.  The Corporation argues in response that the plaintiffs failed to raise this argument before the Appeals Board.  See Def.'s Reply at 20.  This Court has previously noted that "[t]he District of Columbia Circuit has consistently held that courts 'are bound to adhere to the hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review,'" Veloxis Pharm. v. FDA, 109 F. Supp. 3d 104, 122 (D.D.C. 2015) (Walton, J.) (quoting Coburn v. McHugh, 679 F.3d 924, 929 (D.C. Cir. 2012)), "[a]nd the Circuit has clarified that the standard for waiver in administrative law cases focuses on whether the 'specific argument' put forth by the plaintiff was raised before the agency . . . not merely the same general legal issue," id. at 123 (citing Koretoff v. Vilsack, 707 F.3d 394, 398 (D.C. Cir. 2013)).  Upon review of the plaintiffs' brief submitted to the Appeals Board, the Court agrees with the Corporation that the plaintiffs did not raise their argument that the PWA provision incorporating the qualified benefit limit increase must apply to both active and retired pilots because other subsections of the PWA explicitly apply to retired pilots.  See AR 581–84.  Therefore, because the plaintiffs did not give the Appeals Board an opportunity to consider the merits of this specific argument at the administrative level, that argument is waived. See Veloxis Pharm., 109 F. Supp. 3d at 123.

non-guaranteed benefits as being in PC5(b) (for which there is no funding) instead of PC5(a), despite the fact that these benefits were 'in effect' as of September 2, 2001.").

As noted above, see supra at note 14, the Corporation's determinations of recovery benefits "shall be binding unless shown by clear and convincing evidence to be unreasonable," 29 U.S.C. § 1322(c)(4). The Court will consider the plaintiff's two arguments in turn.

### 1. The Corporation's Calculation of the Recovery Benefits

As explained above, supra at 6, the ERISA statute designates how the trustee should calculate the portion of the recovery funds available for payment to participants and beneficiaries: it must "multiply[]—(A) the outstanding amount of benefit liabilities under the plan (including interest calculated from the termination date), by (B) the applicable recovery ratio," 29 U.S.C. § 1322(c)(2). At issue in Claim Five is how the Corporation calculated the recovery ratio, which is prescribed by statute as follows:

> (i) the value of the recoveries of the [C]orporation [for a single-employer plan terminated under a distress termination] to
>
> (ii) the amount of unfunded benefit liabilities under such plan as of the termination date.

Id. § 1322(c)(3)(C). The Corporation's recovery amount as of the valuation date was $1,279,506,423. AR 42. "To reflect interest, [the] PBGC discounted the value of [its] recovery . . . by $50,501,683, resulting in a [date of plan termination] (September 2, 2006) recovery value of $1,229,004,740." AR 43.

The plaintiffs argue that the Corporation's calculation of the recovery amount was unreasonable because it "employed [an] extra-statutory actuarial adjustment[] to the recovery ratio" than actually provided by Congress. Pls.' Mem. at 36.[20] Specifically, the plaintiffs

---

[20] The plaintiffs also assert that the Corporation made an additional "extra-statutory actuarial adjustment[]," Pls.'

(continued . . . )

contend that the Corporation's decision to "reduce[] the recovery amount by . . . $50 million (approximately) to reflect its value on the date of Plan termination," id. at 35, was unreasonable because Congress explicitly directed the Corporation to calculate the ratio's denominator as of the Plan's termination date, but Congress did not direct the Corporation to factor that date into the numerator, see id. at 36; see also Pls.' Reply at 35. And therefore, according to the plaintiffs, the "Corporation's decision to discount both parts of the ratio by the termination date violated th[e] cardinal rule of statutory construction" that presumes that Congress "intentionally and purposely" "include[d] particular language in one section of a statute but omit[ted] it in another section of the same Act." Pls.' Mem. at 36 (quoting Russello v. United States, 464 U.S. 16, 23 (1983)); see also Pls.' Reply at 36 (same).

The Corporation argues in response that "[t]he Appeals Board's conclusion that, in determining monies allocable to participants' benefits, [the] PBGC must discount its recoveries to the Plan's termination date is entirely reasonable, and easily passes the 'clear and convincing' standard under the statute." Def.'s Mem. at 39–40. From the Corporation's perspective, "to reflect interest, [it] had to discount the value of its recovery to September 2, 2006," the date of

( . . . continued)
Mem. at 36, when it discounted the recovery value from approximately $1.285 billion to $1.279 billion "in order to actuarially adjust these recoveries to their value as of May 3, 2007[,] the date when the PBGC received its first recovery," id. at 35. The plaintiffs not only did not raise any argument regarding the approximately $5.5 million adjustment in their brief to the Appeals Board, see AR 593–98 (section of the brief addressing the Corporation's alleged errors regarding its calculation and allocation of the recovery funds), but actually argued that $1.279 billion was the proper recovery value, see id. 595 ("In the case of the Delta Pilots Plan, 'the total value of the [PBGC's] Recovery as of the May 3, 2007 Valuation Date is $1,279,506,423.' Thus, according to the unambiguous language of the statute, for purposes of calculating the [ ] amount [available for payment to participants and beneficiaries], the recovery ratio should have utilized this recovery amount." (first alteration in original) (internal citations omitted)). Moreover, the plaintiffs argue for the first time in their reply that the Corporation's "decision to impose an extra-statutory discount to all recoveries is a 'policy matter' that stands to 'have a significant impact' on Title IV's 'stakeholders,'" Pls.' Reply at 36 (quoting 29 C.F.R. § 4002.3(a)(3)(v)), and, according to the Corporation's own regulations, this determination "may only be made by the Corporation's Board of Directors, and cannot be delegated or, if delegated, no deference adheres to the Corporation's decision under Page," id. As previously explained, see supra at note 19, because the plaintiffs did not give the Appeals Board an opportunity to consider the merits of either of these arguments, they are waived. See Veloxis Pharm., 109 F. Supp. 3d at 123; see also Nytes, 297 F. Supp. 3d at 202 ("Judges in this District have repeatedly held that arguments may not be raised for the first time in a party's reply." (collecting cases)).

the Plan's termination, because the ERISA defines the value of its recoveries, which make up the numerator of the recovery ratio, in terms of their value as of the Plan's termination date. See id. at 40.

Upon review of the statute, the Court concludes that the Corporation's decision to value its recoveries as of the date of the Plan's termination passes muster under the clear and convincing standard. 29 U.S.C. § 1362, which establishes the liability of an employer upon the termination of a single-employer plan, has two categories of liability: liability to the Corporation, see id. § 1362(b), and liability to the § 1342 trustee, see id. § 1362(c). The first category, the liability to the Corporation, is described as "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the [C]orporation." Id. § 1362(b)(1)(A) (emphasis added). The second category, the liability to the § 1342 trustee, which in this case is also the Corporation, is described, in relevant part, as

> the sum of the shortfall amortization charge . . . with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of shortfall amortization installments (if any) determined for succeeding plan years . . . and [ ] the sum of the waiver amortization charge . . . with respect to the plan (if any) for the plan year in which the termination date occurs, plus the aggregate total of waiver amortization installments (if any) determined for succeeding plan years . . . , together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the [C]orporation.

Id. § 1362(c) (emphasis added). Returning to the recovery ratio, the numerator is defined as "the value of the recoveries of the [C]orporation under section 1362, 1363, or 1364 of this title in connection with such plan." Id. § 1322(c)(3)(C)(i). Because the "recoveries . . . under section 1362," id., the section relevant in this case, are both defined in terms of their value as of the date

of the Plan's termination, see id. § 1362(b)(1)(A), (c), the Court concludes that the Corporation's

determination to adjust the recovery value to reflect its value as of the date of the Plan's

termination is reasonable. Although the plaintiffs are correct that Congress did not explicitly

state that the numerator of the recovery ratio should be valued as of the date of a plan's

termination, as it did with the denominator, see Pls.' Mem. at 36, Congress did define the

components of the numerator of the recovery ratio in terms of their value as of the date of a

plan's termination in other provisions of the statute. Thus, the Corporation reasonably construed

these statutory provisions together to determine that the numerator of the recovery ratio must be

calculated as of the date of a plan's termination. See Motion Picture Ass'n of Am., Inc. v. FCC,

309 F.3d 796, 801 (D.C. Cir. 2002) ("Statutory provisions in pari materia are construed together

to discern their meaning." (citing Erlenbaugh v. United States, 409 U.S. 239, 244 (1972))).

## 2. The Corporation's Allocation of the Recovered Funds

Next, similar to their arguments in Claims Three and Four, the plaintiffs argue that the

Corporation erred in not applying the increased compensation and qualified benefit limits in its

calculation of the plaintiffs' PC5(a) benefits, which include benefits "in effect at the beginning of

the [five]-year period ending on the date of plan termination," 29 U.S.C. § 1344(b)(4)(A),

"because the statutory language [ ] 'in effect' is even more favorable to [the p]laintiffs under

PC5(a) than under PC3," Pls.' Mem. at 37.

The ERISA provision regarding PC3 benefits provides that "in the case of benefits

payable as an annuity, the plan administrator shall allocate the assets of the plan (available to

provide benefits) among the participants and beneficiaries in the following order":

> (A)    in the case of the benefit of a participant or beneficiary which was in pay
>         status as of the beginning of the [three]-year period ending on the
>         termination date of the plan, to each such benefit, based on the provisions

<u>of the plan (as in effect during the [five]-year period ending on such date)
under which such benefit would be the least</u>, [and]

(B)     in the case of a participant's or beneficiary's benefit (other than a benefit
described in subparagraph (A)) which would have been in pay status as of
the beginning of such [three]-year period if the participant had retired prior
to the beginning of the [three]-year period and if his benefits had
commenced (in the normal form of annuity under the plan) as of the
beginning of such period, <u>each such benefit based on the provisions of
the plan (as in effect during the [five]-year period ending on such date)
under which such benefit would be the least</u>.

For purposes of subparagraph (A), the lowest benefit in pay status during a [three]-year period shall be considered the benefit in pay status for such period.

29 U.S.C. § 1344(a)(3) (emphasis added).

The ERISA provision regarding PC5 benefits provides that the administrator shall allocate "all other nonforfeitable benefits under the plan," <u>id.</u> § 1344(a)(5), but then provides that, "if the assets available for allocation under [PC5] are not sufficient to satisfy in full the benefits of individuals described in that paragraph,"

(A)     . . . [E]xcept as provided in subparagraph (B), the assets shall be allocated
to the benefits of individuals described in such paragraph (5) on the basis of
the <u>benefits of individuals which would have been described in such
paragraph (5) under the plan as in effect at the beginning of the [five]-year
period ending on the date of plan termination</u>.

(B)     If the assets available for allocation under subparagraph (A) are sufficient
to satisfy in full the benefits described in such subparagraph (without regard
to this subparagraph), then for purposes of subparagraph (A), benefits of
individuals described in such subparagraph shall be determined on the basis
of the plan as amended by the most recent plan amendment effective during
such [five]-year period under which the assets available for allocation are
sufficient to satisfy in full the benefits of individuals described in
subparagraph (A) and any assets remaining to be allocated under such
subparagraph shall be allocated under subparagraph (A) on the basis of the
plan as amended by the next succeeding plan amendment effective during
such period.

<u>Id.</u> § 1344(b)(4) (emphasis added).  Therefore, PC5(a) includes vested benefits as of five years prior to the plan's termination, <u>see id.</u> § 1344(b)(4)(A), while PC5(b) includes all other vested

benefits that went into effect on a later date, which cannot be funded unless all benefits in PC5(a) are funded, see id. § 1344(b)(4)(B).

The plaintiffs challenge "the Corporation's decision to apply [to] PC5(a) 'the same rules governing when a plan provision or amendment is in effect for purposes of determining the PC3 benefit,'" Pls.' Mem. at 38 (quoting AR 51), because the statutory language for PC3 and PC5(a) is "materially different," id. (comparing 29 U.S.C. § 1344(a)(3) (focusing on the language "under which such benefit would be the least"), with id. § 1344(b)(4)(A) (focusing on when the plan provision went into effect)); see also Pls.' Reply at 38 ("The PC3 language expressly incorporates language referencing when benefit amounts were in pay status, under which such benefits would be the least, while the PC5(a) statute focuses solely on when a plan provision is in effect."). The plaintiffs note that "while the Corporation has promulgated rules relating to when a benefit is 'in effect' under PC3, there is no PC5 regulation discussing when a benefit is in effect to guide the Court's inquiry." Pls.' Mem. at 38. In the plaintiffs' view, the differences in the statutory language "are significant because the emphasis [for PC5(a)] is placed entirely on the effectiveness of the plan provision, eliminating any reference to whether the benefit was in pay status during the five year period, or the amount of such benefit." Pls.' Reply at 39. They further argue that their interpretation is more consistent with the "ERISA's asset allocation scheme[, which] favors the benefits of a plan's retirees before those of its active participants." Pls.' Mem. at 40.

The Corporation responds that "[t]he Appeals Board reasonably concluded that the same rules governing when a plan provision . . . is 'in effect' for purposes of determining the PC3 benefit . . . should be applied to the PC5[a] subcategor[y]," and noted that the Appeals "Board cited similar language in these statutory provisions." Def.'s Mem. at 42. The Corporation notes

that the Appeals Board determined that the fact "that the PC5[(a)] provision does not include the phrase 'under which such benefit would be the least,' as does the PC3 provision," was irrelevant because "PC5 covers the portion of a participant's nonforfeitable benefit that is not already assigned to the higher priority categories." Id. And, the Corporation argues that the statutory differences between PC3 and PC5(a) "do not eliminate the requirement that a benefit increase be 'in effect' five years before the termination date." Def.'s Reply at 23. In response to the plaintiffs' argument that the policy underlying the ERISA is to prioritize retirees over active participants, the Corporation agrees that "[t]his is certainly true for PC3, and is the reason why it comes before PC4. But[, the Corporation argues that] nothing in the statute suggests that within other priority categories, the benefits of retirees have a higher status than those of active participants." Def.'s Mem. at 43.

In Davis II, the Circuit concluded that "[t]he statutory phrase 'in effect' in § 1344(a)(3)(A) is ambiguous." 734 F.3d at 1168. Therefore, the issue the Court must resolve here is whether, under Chevron step two, the Corporation's decision to interpret the phrase "in effect" for PC5(a) the same way it interprets the phrase "in effect" for PC3 is reasonable. The Court concludes that it is.

As the Appeals Board noted, it chose to interpret the words "in effect" in the PC5(a) provision the same way it interprets the words "in effect" in the PC3 provision given the "ERISA's statutory structure regarding the benefits that [the] PBGC pays." AR 51. It noted that the statute that "establishes the PC5 subcategories[] is similar to [the] ERISA's PC3 and phase-in limit provisions because the provisions each contain a [five]-year look-back period based upon when a plan provision or amendment is 'effective' or 'in effect.'" AR 51. Although the plaintiffs are correct that the statutory provisions in § 1344(a)(3) and § 1344(b)(4)(A) are not identical, it

still remains that Congress chose not to define the words "in effect" under either provision, and it used the same five-year period under both provisions. See 29 U.S.C. § 1344(a)(3), (b)(4)(A). So, even assuming the plaintiffs' interpretation is plausible, the Corporation's decision to apply the same definition of the words "in effect" to both the PC3 and PC5(a) provisions is entirely reasonable. See PBGC v. Asahi Tec Corp., 979 F. Supp. 2d 46, 72 (D.D.C. 2013) ("In sum, both parties have made reasonable and compelling arguments regarding the proper interpretation of [an ERISA provision] . . . . They have pointed to various sections of [the] ERISA . . . to support their positions. The Court has wrestled with the question and has been unable to distill a clear answer from the text of the statute. Under those circumstances, the law requires the Court to defer to the agency's interpretation."); see also Am. Council on Educ. v. FCC, 451 F.3d 226, 234 (D.C. Cir. 2006) ("We cannot set aside the [agency's] reasonable interpretation of the Act in favor of an alternatively plausible (or even better) one." (collecting cases)). Therefore, the plaintiffs have failed to demonstrate "by clear and convincing evidence" that the Corporation's determinations regarding the plaintiffs' recovery benefits were unreasonable. See 29 U.S.C. § 1322(c)(4).[21]

---

[21] The plaintiffs also challenge the Corporation's definition of the words "in effect," arguing that the Corporation's allegation that its interpretation is "consistent with the 'ordinary meaning of the term effective' as being synonymous with the term 'operative.'" See Pls.' Mem. at 38–39 (quoting AR 302). Because the plaintiffs cite the Corporation's interpretation of the words "in effect" to mean "payable," as explained in the Appeals Board decision in the U.S. Airways case, see AR 302, which was ultimately upheld as reasonable by the Circuit in Davis II, see 734 F.3d at 1167–68, the Court need not further consider how the Corporation has chosen to define the term "in effect." The plaintiffs also argue that the Corporation's interpretation of the words "in effect" is unreasonable because "the benefits of the Active Pilots that the Corporation placed ahead of [the p]laintiffs' benefits do not satisfy the Corporation's 'operative' definition of 'in effect.'" Pls.' Reply at 40 (citing Pls.' Mem. at 39). Once again, because the plaintiffs failed to raise this argument before the Appeals Board, see AR 597–98 (arguing in their administrative brief that the Corporation "erroneously applied [compensation and qualified benefit] limits when allocating recovered funds" solely on the basis of the differences in the statutory provisions for PC3 and PC5(a)), the Court need not consider it, see Veloxis Pharm., 109 F. Supp. 3d at 123.

### III.    CONCLUSION

For the foregoing reasons, the Court concludes that the <u>Chevron</u> framework applies in this matter, and that the arbitrary and capricious standard of review applies to Claims Two through Four of the plaintiffs' First Amended Complaint.  The Court finds that the plaintiffs have failed to establish any arbitrary, capricious, or unlawful agency action based on the administrative record that was properly before the Corporation at the time it rendered its decision, and thus it must enter summary judgment in favor of the Corporation on Claims Two through Four.  The Court must also enter summary judgment in favor of the Corporation on Claim Five because the plaintiffs have failed to show by clear and convincing evidence that the Corporation's determinations regarding the plaintiffs' recovery benefits were unreasonable.  Finally, the Court must dismiss Claim Six, the plaintiffs' APA claim, because it is duplicative of the plaintiffs' claims brought pursuant to the ERISA.  Accordingly, the Court will deny the plaintiffs' motion for summary judgment and grant the Corporation's motion for summary judgment.

**SO ORDERED** this 11th day of June, 2018.[22]


REGGIE B. WALTON
United States District Judge

---

[22] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.